**Lansing, Michigan**

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED JULY 15, 2010

STATE OF MICHIGAN

SUPREME COURT

EDITH KYSER,

        Plaintiff-Appellee,

v

No. 136680

KASSON TOWNSHIP,

        Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

At issue here is: (1) whether the rule articulated in *Silva v Ada Twp*, 416 Mich 153; 330 NW2d 663 (1982), which held that a zoning ordinance is unreasonable if the person challenging the ordinance can show that there are natural resources on the property and that "no very serious consequences" would result from extracting such resources, is constitutionally required; (2) whether the "no very serious consequences" rule violates the constitutional separation of powers; and (3) whether the "no very serious consequences" rule was superseded by the enactment of the exclusionary zoning provision, MCL 125.297a, of the Township Zoning Act (TZA).

We hold that the rule of *Silva* is not a constitutional requirement and, in fact, violates the constitutional separation of powers. Further, we conclude that the rule is superseded by the exclusionary zoning provision, MCL 125.297a of the TZA, now MCL 125.3207 of the Zoning Enabling Act (ZEA). Accordingly, we reverse the Court of Appeals and remand to the trial court for further proceedings.

## I. FACTS AND HISTORY

Defendant, Kasson Township, is heavily underlain with gravel and sand, with over 50 percent of the township being either mostly or moderately suited for gravel mining. In 1988, there were seven gravel mines operating in the township, and over the following six years, there were seven rezoning applications submitted to the township board to allow for additional gravel mining, resulting in both litigation and the establishment of new mining operations. In response, the township took several steps to address its overall mining policy, culminating in the establishment of a gravel mining district in accordance with the ZEA, encompassing 6 of the township's 37 square miles.

Plaintiff, Edith Kyser, owns a 236-acre parcel adjacent to the township's gravel mining district. As with the gravel deposits within the mining district, 115.6 acres of plaintiff's property contain a large deposit of outwash gravel, which is the most commercially valuable type. Plaintiff filed an application to rezone her property to allow for gravel mining, but defendant denied the application, asserting that to do otherwise would undermine Kasson Township's comprehensive zoning plan and prompt additional rezoning applications from similarly situated property owners. Plaintiff then filed this

2

action, claiming that her "due process" rights had been violated by this decision because gravel mining would cause "no very serious consequences" in accordance with *Silva*.

The trial court determined that large quantities of gravel were available from other sources within the township, and because the testimony showed that this existing supply would last well into the "latter part of the 21st century," the trial court "conclude[d] that the public interest in [plaintiff's] gravel is not high." Nevertheless, applying the "no very serious consequences" rule, the trial court examined the consequences alleged by defendant pertaining to traffic safety, traffic noise, impact on surrounding property values, impact on residential development, and the influence on additional rezoning applications. The court concluded that a mining operation on plaintiff's property would result in no "very serious consequences" and enjoined enforcement of the zoning ordinance.

On appeal, the Court of Appeals affirmed, concluding that plaintiff had established that no "'very serious consequences'" would result from her proposed mining. 278 Mich App 743, 760; 755 NW2d 190 (2008). The Court of Appeals dissent reasoned that applying the rule without considering the effect on the township's zoning plan essentially nullified the plan because the "only effective limitations on transforming the entirety of Kasson Township into a gravel mine would be the existence of gravel on a given parcel of property and the property owner's own interest in mining." *Id*. at 773 (opinion by DAVIS, J.). Additionally, it observed that the gravel district had been formed as a "result of intensive planning efforts . . . to prevent . . . uncontrolled intrusion of mining into any part of the township that would support it, irrespective of the consequences to the

3

community." *Id*. Thus, the destruction of defendant's plan and the disruption to the community "constitutes a 'very serious consequence.'" *Id*. at 774. We then granted defendant's application for leave to appeal. 483 Mich 982 (2009).

## II. STANDARD OF REVIEW

This case presents issues of constitutional and statutory interpretation, which we review de novo. *Dep't of Transp v Tomkins*, 481 Mich 184, 190; 749 NW2d 716 (2008).

## III. ANALYSIS

## A. JUDICIAL REVIEW OF ZONING

Zoning constitutes a legislative function. *Schwartz v City of Flint*, 426 Mich 295, 309; 395 NW2d 678 (1986). The Legislature has empowered local governments to zone for the broad purposes identified in MCL 125.3201(1).[1] This Court has recognized zoning as a reasonable exercise of the police power that not only protects the integrity of a community's current structure, but also plans and controls a community's future development. *Austin v Older*, 283 Mich 667, 674-675; 278 NW 727 (1938). Because

---

[1] MCL 125.3201(1) provides:

> A local unit of government may provide by zoning ordinance for the regulation of land development and the establishment of 1 or more districts within its zoning jurisdiction which regulate the use of land and structures to meet the needs of the state's citizens for food, fiber, energy, and other natural resources, places of residence, recreation, industry, trade, service, and other uses of land, to ensure that use of the land is situated in appropriate locations and relationships, to limit the inappropriate overcrowding of land and congestion of population, transportation systems, and other public facilities, to facilitate adequate and efficient provision for transportation systems, sewage disposal, water, energy, education, recreation, and other public service and facility requirements, and to promote public health, safety, and welfare.

4

local governments have been invested with a broad grant of power to zone, "it should not be artificially limited." *Delta Charter Twp v Dinolfo*, 419 Mich 253, 260 n 2; 351 NW2d 831 (1984). Recognizing that zoning is a legislative function, this Court has repeatedly stated that it "'does not sit as a superzoning commission.'" *Macenas v Village of Michiana*, 433 Mich 380, 392; 446 NW2d 102 (1989) (citation and emphasis omitted); *Brae Burn, Inc v Bloomfield Hills*, 350 Mich 425, 430-431; 86 NW2d 166 (1957). Instead, "[t]he people of the community, through their appropriate legislative body, and not the courts, govern its growth and its life." *Brae Burn*, 350 Mich at 431. We reaffirm these propositions.

However, the local power to zone is not absolute. When the government exercises its police power in a way that affects individual constitutional rights, a citizen is entitled to due process of law. *Id.* at 437. The Due Process Clause is included in Const 1963, art 1, § 17 of the Michigan Constitution and provides in pertinent part: "No person shall . . . be deprived of life, liberty or property, without due process of law. . . ." "The test to determine whether legislation enacted pursuant to the police power comports with due process is whether the legislation bears a reasonable relation to a permissible legislative objective." *Shavers v Attorney General*, 402 Mich 554, 612; 267 NW2d 72 (1978). The level of the governmental interest that is sufficient depends on the nature of the affected private interest. See *id.* at 613 n 37. When the individual interest concerns restrictions on the use of property through a zoning ordinance, the question is ""whether the power, as exercised, involves an undue invasion of private constitutional rights without a reasonable justification in relation to the public welfare."" *Schwartz*, 426

5

Mich at 309, quoting *Norwood Builders v City of Des Plaines*, 128 Ill App 3d 908, 917; 471 NE 2d 634 (1984), quoting *Exch Nat'l Bank v Cook Co*, 25 Ill 2d 434, 440; 185 NW2d 250 (1962).  A zoning ordinance is presumed to be reasonable.  *Brae Burn*, 350 Mich at 432.  Starting with such a presumption, the burden is upon the person challenging such an ordinance to overcome this presumption by proving that there is no reasonable governmental interest being advanced by the zoning ordinance.  *Id.*  Stated another way, the challenger must demonstrate "that the ordinance is an arbitrary and unreasonable restriction upon the owner's use of his property."  *Id*.  Under this standard, a zoning ordinance will be struck down only if it constitutes "an arbitrary fiat, a whimsical *ipse dixit*, and . . . there is no room for a legitimate difference of opinion concerning its [un]reasonableness."  *Id*. [2]

---

[2]  Although the standard of review for zoning regulations and decisions is characterized as a "reasonableness" test, it bears analogy to the "rational basis" standard of review that is used to test the constitutionality of legislation where there are no "suspect" factors or "fundamental rights" involved or where "heightened scrutiny" is otherwise inapposite.  *Phillips v Mirac, Inc*, 470 Mich 415, 432-433; 685 NW2d 174 (2004).  In *TIG Ins Co, Inc v Dep't of Treasury*, 464 Mich 548, 557-558; 629 NW2d 402 (2001), this Court defined "rational basis" review as follows:

"Rational basis review does not test the wisdom, need, or appropriateness of the legislation, or whether the classification is made with 'mathematical nicety,' or even whether it results in some inequity when put into practice."  *Crego v Coleman*, 463 Mich 248, 260; 615 NW2d 218 (2000).  Rather, it tests only whether the legislation is reasonably related to a legitimate governmental purpose.  The legislation will pass "constitutional muster if the legislative judgment is supported by any set of facts, either known or which could reasonably be assumed, even if such facts may be debatable."  *Id.* at 259-260.  To prevail under this standard, a party challenging a statute must overcome the presumption that the statute

6

## B. "NO VERY SERIOUS CONSEQUENCES" RULE

The "no very serious consequences" rule constitutes an exception to the "reasonableness" test for assessing the constitutionality of zoning regulations and provides that "regulations which prevent the extraction of natural resources are invalid unless 'very serious consequences' will result from the proposed extraction." *Silva*, 416 Mich at 156. This rule appears to have originated in *City of North Muskegon v Miller*, 249 Mich 52, 54; 227 NW 743 (1929), which addressed whether a zoning ordinance could prohibit a landowner from drilling for oil on his property. This Court observed:

> The courts have particularly stressed the importance of not destroying or withholding the right to secure oil, gravel, or mineral from one's property, through zoning ordinances, unless some very serious consequences will follow therefrom. *Village of Terrace Park v. Errett* [12 F2d 240 (CA 6, 1926)]. [*Id*. at 57.][3]

is constitutional. *Thoman v Lansing*, 315 Mich 566, 576; 24 NW2d 213 (1946).

[3] *Errett* involved a zoning ordinance that prohibited gravel mining in a suburb of Cleveland, Ohio. The United States Court of Appeals for the Sixth Circuit asserted:

> There is . . . a substantial difference between an ordinance prohibiting manufacturing or commercial business in a residential district that may be conducted in another locality with equal profit and advantage, and an ordinance that wholly deprives the owner of land of its valuable mineral content. [*Id*. at 243.]

The Sixth Circuit neither discussed nor applied what emerged in *Miller* as the "no very serious consequences" rule. Instead, it considered the diminishment of property value if gravel mining was prohibited as a relevant factor in determining whether the zoning ordinance constituted a reasonable exercise of the police power. *Id*. at 242. The court concluded that the ordinance was not such an exercise. It is worth noting that *Errett* was decided seven months before the landmark decision of *Village of Euclid v Ambler Realty Co*, 272 US 365; 47 S Ct 114; 71 L Ed 303 (1926), in which the United States Supreme Court established the standard of review for adjudicating due process

In defining the applicable test, *Miller* stated that "a zoning ordinance [must] be reasonable, and the reasonableness becomes the test of its legality." *Id*. This Court further explained that a zoning ordinance must be "'reasonably necessary for the preservation of public health, morals, or safety . . . where such necessity appears either from existing conditions or reasonable anticipation of future growth and development.'" *Id*. at 58, quoting *Errett*, 12 F2d at 241.

Viewed in context, the "no very serious consequences" rule of *Miller* was not a rule, but a definition of one factor to consider when assessing whether a zoning ordinance was reasonable. Rather than applying this rule to the zoning ordinance in that case, this Court held that the zoning ordinance was unreasonable because the restriction on the property's use rendered the property practically worthless. *Id.* at 57. Accordingly, we determined that the zoning ordinance, as applied, was "unreasonable and confiscatory, and therefore illegal." *Id*. at 59.[4]

---

claims against zoning ordinances-- the reasonableness standard. Before *Euclid*, the states had been divided as to whether zoning constituted a constitutional exercise of the police power. *Euclid* held that it was. 1 Salkin, American Law of Zoning (5th ed), § 2:21.

[4] Once this Court concluded that the zoning ordinance was unreasonable as applied, it turned its attention to a companion drilling ordinance, holding that it was reasonable because the proposed drilling could potentially contaminate the city's water supply. *Id*. at 62-63. Although there was evidence that the landowner could avoid this danger, we held that "it is not within our province to regulate the action of the city officials when they act within their legal rights." *Id*. at 63. It is unclear whether we also applied the "no very serious consequences" rule to the drilling ordinance. Admittedly, potentially contaminating the city's water supply constitutes a "very serious consequence." However, potential contamination of the water supply would also be independently sufficient to conclude that the drilling ordinance was reasonable.

For almost three decades, *Miller* was viewed as standing for two propositions, neither of which embodied a "no very serious consequences" rule. First, if "the property involved was unfit for the use to which it was restricted, [then] the ordinance was unreasonable and confiscatory and, therefore, illegal." *Pleasant Ridge v Cooper*, 267 Mich 603, 606; 255 NW 371 (1934); *Hammond v Bloomfield Hills Bldg Inspector*, 331 Mich 551, 557; 50 NW2d 155 (1951); *Ervin Acceptance Co v City of Ann Arbor*, 322 Mich 404, 408; 34 NW2d 11 (1948); *Oschin v Redford Twp*, 315 Mich 359, 363; 24 NW2d 152 (1946). Second, a zoning ordinance must be "reasonable in its operation," and an "arbitrary action or the unreasonable exercise of authority may not be justified." *Hitchman v Oakland Twp*, 329 Mich 331, 335; 45 NW2d 306 (1951); *Redford Moving & Storage Co v Detroit*, 336 Mich 702, 707; 58 NW2d 812 (1953); *Grand Trunk R Co v Detroit*, 326 Mich 387, 398; 40 NW2d 195 (1949).

The "no very serious consequences" rule resurfaced in the late 1950s in two opinions, *Bloomfield Twp v Beardslee*, 349 Mich 296; 84 NW2d 537 (1957), and *Certain-teed Prod Corp v Paris Twp*, 351 Mich 434; 88 NW2d 705 (1958). In both cases, Justice BLACK, citing *Miller*, applied the rule without articulating any due process considerations with regard to whether the zoning ordinance was reasonable.[5] Also in

_____

[5] In *Beardslee*, Justice BLACK issued a "concurring" opinion, although it was actually the majority opinion because three justices joined this opinion; only two justices joined Justice SMITH's asserted "lead" opinion. Later, in *Certain-teed*, Justice BLACK's opinion is presented as a "concurring in part and dissenting in part" opinion. However, again, three justices joined Justice BLACK's opinion and only one joined Justice EDWARDS' asserted "lead" opinion while another concurred in the result of the lead opinion.

both cases, the rationale for the rule seemed predicated on the ideas that natural resources can only be extracted from where they are found and that a local government cannot zone beneath the surface.[6]  Additionally, in both cases the threshold question was viewed as whether the proposed mining operations would create an enjoinable nuisance.[7]

In *Beardslee*, 349 Mich at 301, the defendant landowner was enjoined from surface mining gravel on a parcel of land that was not zoned for that use.  While the "lead" opinion upheld the zoning ordinance because it was "reasonable,"[8] Justice BLACK

---

[6] Other than *Miller* and *Errett*, Justice BLACK does not cite authority for the proposition that a local government cannot zone beneath the surface; neither *Miller* nor *Errett* appears to stand for this proposition.  Rather, a local government is empowered to establish zoning ordinances to regulate land development and to "regulate the use of land and structures to meet the needs of the state's citizens for . . . natural resources . . . ." MCL 125.3201(1).  There are no apparent distinctions in the law between regulating surface and subsurface lands.  Nevertheless, even assuming that a local government cannot zone beneath the surface, it can still regulate the surface, including any land use and structures on the surface that may be created in support of subsurface mining.

[7] Although nuisance is obviously one harm that zoning regulations seek to prevent, since at least *Euclid*, zoning laws have never been confined to *only* preventing nuisances. *Euclid*, 272 US at 387-388.

[8] In response to the argument in *Beardslee* that a landowner has a "'legal right to exploit natural resources where they may be found,'" Justice SMITH stated:

> Attractive though the argument may seem upon its first reading, it must be obvious that a logical application of its principle would be destructive of all zoning.  For in each case the particular parcel has, it is always asserted, some peculiar utility: it is an ideal spot for a motel, or a factory, or a junk yard, or what not.  It has that contiguity to traffic, that peculiar topographical structure, that supply of water or shade, which makes it unique.  Yet, just as the surface user desired by the owner must give way, at times, to the public good, as must the subsurface exploitation. In each case the question is whether, on the peculiar facts before us, the ordinance is a reasonable regulation in the interests of the public good, or

in his majority opinion rejected this theory and upheld the trial court's ruling on the theory that the gravel mining operation would create a public nuisance. *Id.* at 310-311. He explained that he could not uphold the ordinance on the alternate constitutional ground supported by the "lead" opinion because of "concern over the implications of zoning the depths distinguished from zoning the surface," and cited the "no very serious consequences" rule in *Miller* and *Errett*. *Id*. at 310-311.

In *Certain-teed*, 351 Mich at 439, the plaintiff was denied a permit to mine and manufacture gypsum in a 500-foot area zoned for various industrial uses, including gypsum mining, and was denied a permit to extend the industrial zone by 750 feet. The first issue was whether the defendant township erred by rejecting the plaintiff's proposed construction of a manufacturing facility within the industrial zone and its requested extension of 750 feet for the same purpose. *Id*. at 445-446. The second issue was whether the zoning ordinance could prohibit subsurface mining if there was minimal surface interference within areas zoned for agricultural use. *Id*. In his majority opinion, Justice BLACK agreed with the "lead" opinion that the ordinance did not prohibit the plaintiff's proposed mining operation. However, concerned about a zoning ordinance that attempted to regulate subsurface mining, he stated:

> As an ordinance enacted pursuant to our township rural zoning act projects its regulatory tentacles toward nether regions, the proponent side of the "debatable question" is progressively weakened and the contestant voice is correspondingly strengthened. This I think was made clear by the warning rule of *City of North Muskegon v. Miller*, 249 Mich 52. To sustain

whether it is an arbitrary and whimsical prohibition of a property owner's enjoyment of all of the benefits of his title. [*Id*. at 303.]

11

the ordinance in such case there must be some dire need which, if denied the ordained protection, will result in "very serious consequences." So, and if the ordinance in its proposed application to mining fails to meet the test . . . , the result must be a judicial determination of constitutional unreasonableness. [*Id*. at 466-467.]

This represents the first occasion in which the "no very serious consequences" rule was offered as a constitutional test of reasonableness, and as a *sufficient* test of reasonableness. While Justice BLACK concluded that the zoning ordinance did not prohibit mining, he was not convinced that the mining operation would not create an enjoinable nuisance, even though the landowner presented evidence that it could avoid this. *Id*. at 468. However, unlike in *Miller*, in *Certain-teed*, this Court allowed the landowner to proceed with its mining operation provided that it would not create an enjoinable nuisance. *Id*. at 470-473.[9] Therefore, in contrast to *Miller*, the rule as applied in *Certain-teed* made it considerably more difficult for a local government to regulate the extraction of natural resources.

After *Certain-teed*, the "no very serious consequences" rule was not applied again until *Silva*, over 20 years later. In *Silva*, we asserted that we were reaffirming the rule originally articulated in *Miller* and *Certain-teed*. Under this rule, "[t]he party challenging the zoning has the burden of showing that there are valuable natural resources and that no 'very serious consequences' would result from the extraction of those resources." *Silva*, 416 Mich at 162. We explained that the basis for the "no very serious consequences"

---

[9] We then remanded to the trial court for ongoing judicial supervision of the plaintiff's mining operation, *id*. at 472-473, and indicated that an injunction might be necessary if the mining operation became a future nuisance. *Id*. at 470-471.

12

rule, or the "more rigorous standard of reasonableness," was the "important public interest in extracting and using natural resources" and that "[n]atural resources can only be extracted from the place where they are located and found." *Id*. at 158-159. Additionally, we expressed concern with an "'ordinance that wholly deprives the owner of land of its valuable mineral content.'" *Id*. at 160, quoting *Errett*, 12 F2d at 243. Thus, the *Silva* rule made it even more difficult than *Certain-teed* for a local government to limit the extraction of natural resources through zoning ordinances.[10]

In sum, the "no very serious consequences" rule originated in *Miller* as but a single factor in determining whether a zoning ordinance that regulates the extraction of natural resources is reasonable. The "rule" was not mentioned again for 30 years until *Beardslee* and *Certain-teed*, in which it was transformed from one factor in the test of reasonableness into a *sufficient* test of reasonableness. Furthermore, in *Beardslee* and *Certain-teed*, the "very serious consequences" were confined to enjoinable nuisances, although a landowner could nevertheless proceed under judicial supervision if the nuisance could be avoided. Then, after another 20 years, the rule reemerged in *Silva*, and was transformed to signify that "zoning regulations which prevent the extraction of natural resources are invalid unless 'very serious consequences' will result from the proposed extraction," and without consideration being given to judicial supervision.

_____

[10] Justice RYAN, concurring in part and dissenting in part, observed that the Court's decision was unlike the decision in *Certain-teed* because the plaintiffs in the earlier case "were not given *carte blanche* to develop natural resources, and the Court's opinion explicitly contemplated that in the future an injunction shutting down the mining operation might be proper." *Id*. at 165.

13

*Silva*, 416 Mich at 156.  As the rule evolved, it has become progressively more difficult for a local government to regulate the extraction of natural resources by zoning ordinances.

## C.  CONSTITUTIONAL REQUIREMENTS

The first question we must address is whether the "no very serious consequences" rule is a constitutional requirement where a zoning ordinance purports to limit or prevent the extraction of natural resources.  As already discussed, a zoning ordinance or decision is considered valid, i.e., does not violate the Due Process Clause, if it meets the test of "reasonableness."  That is, a zoning ordinance is presumed to be reasonable, and a person challenging such an ordinance carries the burden of overcoming this presumption by proving that there is no reasonable governmental interest being advanced by the ordinance.  *Brae Burn*, 350 Mich at 432.  While the "no very serious consequences" rule may have originated with *Miller* as a factor to consider in determining the reasonableness of a zoning ordinance, its later applications were not based on traditional due process considerations.  From a review of these cases, the central theme that gave rise to the "no very serious consequences" rule is that natural resources can only be extracted from where they are located.  *Errett*, 12 F2d at 243.  Two premises emerged: that prohibiting a landowner from extracting natural resources "'wholly deprives the owner of land of its valuable mineral content,'" *Silva*, 416 Mich at 159-160, quoting *Errett*, 12 F2d at 243, and that "[p]reventing the extraction of natural resources harms the interests of the public . . . ."  *Silva*, 416 Mich at 160.

14

The first of these premises implies that extracting natural resources is somehow a "preferred" land use that defines a more valuable or profitable use of the property than other types of land use.[11] However, a zoning ordinance is not unreasonable just because a prohibited land use is more profitable than the land uses allowed by the zoning ordinance. See *Brae Burn*, 350 Mich at 432-433.[12] With regard to the value or profitability of land, there is no obvious difference in kind between being prevented from extracting resources and being prevented from using the land in any other way. A wide

---

[11] In effect, the "no very serious consequences" rule transformed natural resource extraction into a preferred land use, a doctrine that this Court expressly rejected in *Kropf v Sterling Hts*, 391 Mich 139; 215 NW2d 179 (1974). In *Silva*, Justice RYAN, in dissent, opined that the majority had effectively overruled *Kropf*. In response, Justice LEVIN observed that *Kropf* involved the "validity of zoning ordinances in general," and did not specifically address the no "very serious consequences" rule. *Silva*, 416 Mich at 161. Ironically, to support its conclusion that the "no very serious consequences" rule-- a rule that creates a preferred land use-- sets forth a constitutional test, the dissent relies on the due process concerns raised in *Kropf*. *Post* at 3. While the dissent quotes *Kropf* in this regard, it neglects to include the last three sentences of the paragraph:

> When First Amendment rights are being restricted we require the state to justify its legislation by a "compelling" state interest. With regard to zoning ordinances, we only ask that they be "reasonable". And, as we have stated, they are presumed to be so until the plaintiff shows differently. [*Kropf*, 391 Mich at 158.]

Thus, while this Court explained various due process concerns of zoning regulations, the test used in *Kropf* was nevertheless based on reasonableness, as is our holding in the instant case.

[12] Where a zoning ordinance goes too far, it may be deemed to be a "taking" of private property that requires just compensation under the United States and Michigan constitutions, US Const, Am V; Const 1963, art 10, § 2. *Bevan v Brandon Twp*, 438 Mich 385, 389-390; 475 NW2d 37 (1991). In Michigan, to establish a taking, "[t]he owner must show that the property is either unsuitable for use as zoned or unmarketable as zoned." *Id*. at 403, citing *Kirk v Tyrone Twp*, 398 Mich 429, 444; 247 NW2d 848 (1976). There are no "taking" claims in this case.

array of land uses that are viewed as reasonable in general, including uses that are well-suited to a particular property, can be excluded on the basis of a zoning ordinance, provided that the ordinance is reasonable. When compared with any other unique, and potentially valuable, attributes of a particular property-- its location, its view, its size or configuration, its terrain, its lakes and ponds and wildlife-- minerals on a property do not render it any more unique or valuable in a way that would justify elevating mineral extraction to a specially protected land use by judicial decree. There is simply no basis in the zoning laws of our state, or in our constitution, for judicially adopting such a distinction.

The second premise-- that the public is harmed by preventing the extraction of mineral resources-- presumes that the natural resources are in demand by the public. The flaw of the "no very serious consequences" rule is that it is built on the premise that such resources are *always* in demand by the public, and, therefore, unless there are "very serious consequences," local governments must always defer to the property owner where a zoning regulation affects natural resource extraction. Indeed, in the instant case, the trial court specifically determined that large quantities of gravel were available from other sources within the township and that this supply would last well into the "latter part of the 21st century." Accordingly, the trial court "conclude[d] that the public interest in [plaintiff's] gravel is not high." Despite this, the trial court was compelled under the "no very serious consequences" rule to enjoin defendant from enforcing what the court otherwise would have viewed as a reasonable zoning ordinance.

16

Further, on the basis of a presumed public demand for resources, the "no very serious consequences" test essentially elevates one particular aspect of the "public interest" above all competing aspects, enabling a single consideration to trump all other considerations unless there are "very serious consequences." Through this means, the "no very serious consequences" rule redefines what constitutes the "public interest" and compels communities to allow land uses that may be viewed as contrary to the "public interest." However, all that the constitution's Due Process Clause compels is that a zoning ordinance be reasonably designed and administered to protect the public health, safety, and welfare of the community, and that fair procedures be accorded to participants in the process. *Brae Burn*, 350 Mich at 431-432. We are unable to discern in the constitution any obligation that such a rule be specifically interposed in the zoning process. While the "public interest" in mineral extraction is undeniably one aspect of the overall "public interest," we are not persuaded that the constitution compels either that it be accorded specific weight, or that a particular balancing invariably be undertaken, in the public's calculations of what is "reasonable" and what is in the "public interest." The proper consideration of these many "public interests" is best left to the Legislature and local communities rather than the judiciary.[13]

---

[13] As additional justification for the rule, the dissent relies on language in *Silva*, in which this Court reasoned that "[p]reventing the extraction of natural resources harms the interests of the public as well as those of the property owner by making natural resources more expensive." *Silva*, 416 Mich at 160. However, neither *Silva* nor the dissent cites any legal authority for the proposition that a constitutional standard that is less deferential to the zoning authority is required whenever a regulation makes a natural resource, or any other product, more or less expensive.

17

Plaintiff asserts that the "no very serious consequences" rule is simply a "species" of the reasonableness standard. However, we believe that the rule represents a very significant departure from that standard. Under the rule, a zoning ordinance will be struck down unless "very serious consequences" will result from the extraction of natural resources, without regard to whether the ordinance constitutes a *reasonable* means of addressing the harm that a mining operation might impose on the community. *Silva*, 416 Mich at 156. Thus, rather than presuming that a zoning ordinance is valid, the rule requires just the opposite presumption: that a zoning ordinance pertaining to the regulation of natural resource extraction is invalid and to be upheld if the ordinance is the only means to avoid the "very serious consequences" that would otherwise result. Moreover, even though the rule as set forth in *Silva* specifies that the party challenging the ordinance carries the burden of proof, in practice, he or she must merely demonstrate that no "very serious consequences" will result from the extraction of resources. *Id.* at 162. The party need not show that the ordinance is unreasonable, which is the only showing pertinent to the constitution. Once the challenger has made a preliminary showing that "no very serious consequences" will obtain, the burden shifts to the community to prove otherwise, i.e., to demonstrate that the proposed mining will, in fact, cause "very serious harm" to the community. Otherwise, the ordinance is rendered null and void, and the proposed mining can proceed. It is simply not enough that the community demonstrate that its zoning ordinance is "reasonable."[14] For these reasons,

---

[14] The dissent claims that we conclude "without analysis" that the cases holding

18

we do not believe that the "no very serious consequences" rule is simply a variation upon the "reasonableness" test, and therefore hold that the rule is not a constitutional requirement.[15]

---

that the "no very serious consequences" rule was constitutionally mandated were erroneously decided, and that we are "ignor[ing]" the constitutional underpinnings of the rule. Considering that this opinion fully examines the rule's evolution, as well as its various rationales, we do not view this criticism as well-founded. Indeed, it is the dissent that fails almost completely to explain why the "no very serious consequences" rule is one of "constitutional dimensions." While the dissent argues that the rule is grounded in due process, it ignores the fact that the rule as applied in *Silva* constitutes a significant departure from the traditional reasonableness test-- a test that *is* clearly grounded in the "constitutional dimensions" of due process.

[15] For the reasons set forth above, we believe that the cases that have held that the "no very serious consequences" rule is constitutionally mandated were wrongly decided. Although application of the doctrine of stare decisis is generally the preferred course of action by this Court, for it "'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process,'" it is not an inexorable command. *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000), quoting *Hohn v United States*, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998). "Indeed, these same values are also furthered by judicial decisions that are neutrally grounded in the language of the law, by a legal regime in which the public may read the plain words of its law and have confidence that such words mean what they say and are not the exclusive province of lawyers." *Robertson v Daimler Chrysler Corp*, 465 Mich 732, 756; 641 NW2d 567 (2002). This is especially true with regard to judicial decisions interpreting constitutional provisions. Indeed, the policy of stare decisis "is at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions." *Agostini v Felton*, 521 US 203, 235; 117 S Ct 1997; 138 L Ed 2d 391 (1997). In fact, it is "'our duty to re-examine a precedent where its reasoning or understanding of the Constitution is fairly called into question.'" *Robinson*, 462 Mich at 464 (citations omitted). We further believe that overruling these cases will not result in "practical, real-world dislocations." *Id.* at 466. For these reasons, we overrule those cases that have held that the "no very serious consequences" rule is constitutionally mandated.

D.  SEPARATION OF POWERS

The second question we must consider is whether the "no very serious consequences" rule violates the constitutional separation of powers.  The fundamental principles of separation of powers are embodied in Michigan's Constitution.  Const 1963, art 3, § 2 of the Michigan Constitution provides:

> The powers of government are divided into three branches: legislative, executive and judicial.  No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

In *Commonwealth of Massachusetts v Mellon*, 262 US 447, 488; 43 S Ct 597; 67 L Ed 1078 (1923), the United States Supreme Court explained the concept of separation of powers:

> The functions of government under our system are apportioned.  To the legislative department has been committed the duty of making laws; to the executive the duty of executing them; and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts.  The general rule is that neither department may invade the province of the other and neither may control, direct or restrain the action of the other.

As stated, zoning involves the exercise of a legislative function.  *Schwartz*, 426 Mich at 309.  While it may be appropriate for this Court to review statutes and ordinances to discern whether there is a rational basis for such laws, this Court does "not substitute our judgment for that of the legislative body charged with the duty and responsibility in the premises." *Brae Burn*, 350 Mich at 431.

In *Silva*, this Court established the "no very serious consequences" rule "[b]ecause of the important public interest in extracting and using natural resources."  *Silva*, 416 Mich at 158.  In effect, this judicially created rule established a statewide public policy

20

that prefers natural resource extraction to alternative public policies. However, Const 1963, art 4, § 52 of the Michigan Constitution provides:

> The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The *legislature* shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction. [Emphasis added.]

Michigan's constitution directs the Legislature, not the judiciary, to provide for the protection and management of the state's natural resources.[16] As observed in *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 589; 702 NW2d 539 (2005), policy-making is at the core of the legislative function.[17] By preferring the extraction of natural resources to competing public policies, the "no very serious consequences" rule usurps the responsibilities belonging to both the Legislature and to self-governing local communities.

Additionally, the "no very serious consequences" rule requires courts to engage in an expansive and detailed analysis of land-use considerations as to which they have no

---

[16] While the dissent relies on the first sentence of Const 1963, art 4, § 52, to support its view that the 'no very serious consequences' rule of *Silva* is constitutionally mandated, it dismisses the second sentence that directs the *Legislature* to protect the state's natural resources. Furthermore, the dissent does not explain how a rule that *always favors* the recovery of natural resources, even when such resources are not in high demand, is in accord with Const 1963, art 4, § 52, which declares that *both* conservation and development are paramount public concerns. Const 1963, art 4, § 52 is an obviously hortatory provision of the Constitution, and its exhortations implicate multiple objectives that may often be in conflict.

[17] This Court has the authority to establish and modify the common law. Const 1963, art 3, § 7; see also *Placek v Sterling Hts*, 405 Mich 638, 656-657; 275 NW2d 511 (1979). However, at least outside the realm of the common law, policy decisions are a legislative function. *Devillers*, 473 Mich at 589.

particular expertise.  To assess the myriad factors that are relevant to land-use planning in hundreds of communities across this state requires a decision-making process for which the judicial branch is the least well-equipped among the branches of government.   Such decision-making entails the solicitation of a broad range of disparate views and interests within a community, premised upon widely different visions of that community's future and widely varying attitudes toward "quality of life" considerations, and then a balancing of these views and interests in ways that are not easily susceptible to judicial standards. Indeed, in the instant case, a substantial portion of the trial court's decision consisted of its review of potential "very serious consequences" raised by defendants and an assessment that none of those consequences, in its judgment, were serious enough to prohibit mining on the property.  The court also reviewed potential configurations of the township's gravel mining district and alternative boundaries, opining that it "is not at all clear that [the] district is necessarily the ideal district," and that adding to the district "from time to time is not necessarily a bad idea."   However, the trial court also questioned how it could prevent a large portion of the township from "becoming a gravel pit," and asserted that "some thought about 'where does this end' probably would be a good idea."  In essence, although the trial court undertook conscientiously to do what this Court has directed it to do, the court's deliberations illustrate the kind of balancing of factors, line-drawing, policy judgments, and exercise of discretion that belong to legislative bodies exercising the constitution's "legislative power."  See *Brae Burn*, 86 Mich at 431.  As this case demonstrates, the "no very serious consequences" rule

unavoidably requires a trial court to arrogate unto itself responsibilities akin to that of a super-zoning commission. *Id*. at 430-431.

Ironically, the "no very serious consequences" rule itself potentially creates "very serious consequences" because the rule effectively compels that mineral extraction zoning decisions be made on a case-by-case basis, without methodical consideration being given to other long-term concerns inherent in land-use planning. See *Greater Bible Way Temple of Jackson v City of Jackson*, 478 Mich 373, 389; 733 NW2d 734 (2007) ("A decision whether to rezone property does not involve consideration of only a particular or specific user or only a particular or specific project; rather, it involves the enactment of a new rule of general applicability, a new rule that governs all persons and all projects."). This ad hoc and piecemeal approach to rezoning undermines the efforts of local governments to provide stable land-use development. In *Schwartz*, 426 Mich at 313, this Court observed in this regard:

> Even if the practice [of judicial rezoning] did not offend the separation of powers, the judiciary's zoning track record is not good. See, generally, Babcock, *The Zoning Game Revisited* (1985). Zoning, by its nature, is most uniquely suited to the exercise of the police power because of the value judgments that must be made regarding aesthetics, economics, transportation, health, safety, and a community's aspirations and values in general. By the same token, zoning, which requires linedrawing that oftentimes "by its nature [is] arbitrary," . . . is uniquely unsuited to the judicial arena.

In the case at bar, the township planned its gravel district with the community's active participation, and balanced the economic considerations that gravel mining brought to the community with the impact of such mining on the local "quality of life." However, the "no very serious consequences" rule may well dictate rezoning large portions of the

23

township that have been placed outside the mining zone, thereby defeating the township's own exercises in deliberation, planning, and balancing.

It is the role of the Legislature to establish natural resources policy, and the role of local legislative bodies to plan for and regulate land use in their communities in accordance with the directions of the Legislature. Because the "no very serious consequences" rule compels the judiciary to interject itself inappropriately by second-guessing these legislative decisions, we believe that this rule is incompatible with the constitutional separation of powers.

## E.  ZONING ENABLING ACT

Moreover, the Legislature itself superseded the rule of *Silva* by enacting the exclusionary zoning provision, MCL 125.297a.[18] Determining whether a statute preempts the common law is a matter of legislative intent. *Millross v Plum Hollow Golf Club*, 429 Mich 178, 183; 413 NW2d 17 (1987). Where legislation is comprehensive, providing "'in detail a course of conduct to pursue and the parties and things affected, and designates specific limitations and exceptions,'" then there is a legislative intention that a statute preempt common law. *Hoerstman Gen Contracting, Inc v Hahn*, 474 Mich 66, 74; 711 NW2d 340 (2006), quoting *Millross*, 429 Mich at 183.

---

[18] The trial in *Silva* was concluded in March 1979. *Silva v Ada Twp*, 99 Mich App 601, 604; 298 NW2d 838 (1980). That same month, the Legislature amended the TZA to include the exclusionary zoning provision, MCL 125.297a. See 1978 PA 637. Consequently, in *Silva*, this Court did not consider the amended zoning enabling statute because the case was tried under the earlier statute.

24

MCL 125.297a is now recodified in nearly identical form as MCL 125.3207 under the ZEA,[19] which provides:

> A zoning ordinance or zoning decision shall not have the effect of totally prohibiting the establishment of a land use within a local unit of government in the presence of a demonstrated need for that land use within either that local unit of government or the surrounding area within the state, unless a location within the local unit of government does not exist where the use may be appropriately located or the use is unlawful.

MCL 125.3207 prohibits municipalities from enacting any zoning ordinance "totally prohibiting" a given land use if a "demonstrated need" exists for that use, unless there is no location where the use may be "appropriately located," the use is "unlawful."

Fundamental to determining whether the exclusionary zoning provision supersedes the "no very serious consequences" rule is assessing the provision in the context of the whole ZEA. The ZEA establishes the framework for a local government to create a comprehensive zoning plan to promote the public health, safety, and welfare of the community. MCL 125.3201(1) empowers local legislative bodies to zone for a broad range of purposes and addresses the establishment of land-use districts. In particular, MCL 125.3203(1) pertains to the development of a land-use plan and provides:

> The zoning ordinance shall be based upon a plan designed to promote the public health, safety, and general welfare, to encourage the use of lands in accordance with their character and adaptability, to limit the improper use of land, to conserve natural resources and energy, to meet the needs of the state's residents for food, fiber, and other natural resources,

---

[19] Until 2006, there were three separate zoning enabling acts in Michigan: one for city and village zoning, one for township zoning, and one for county zoning. In 2006, the Legislature enacted the ZEA, 2006 PA 110, effective July 1, 2006, which consolidated the zoning enabling authority for all local governments. MCL 125.3101 *et seq.*

places of residence, recreation, industry, trade, service, and other uses of land, to insure that uses of the land shall be situated in appropriate locations and relationships, to avoid the overcrowding of population, to provide adequate light and air, to lessen congestion on the public roads and streets, to reduce hazards to life and property, to facilitate adequate provision for a system of transportation, sewage disposal, safe and adequate water supply, education, recreation, and other public requirements, and to conserve the expenditure of funds for public improvements and services to conform with the most advantageous uses of land, resources, and properties. The zoning ordinance shall be made with reasonable consideration to the character of each district, its peculiar suitability for particular uses, the conservation of property values and natural resources, and the general and appropriate trend and character of land, building, and population development.

These provisions reveal the comprehensive nature of the ZEA. It defines the fundamental structure of a zoning ordinance by requiring a zoning plan to take into account the interests of the entire community and to ensure that a broad range of land uses is permitted within that community. These provisions empower localities to plan for, and regulate, a broad array of land uses, taking into consideration the full range of planning concerns that affect the public health, safety, and welfare of the community. *Burt Twp v Dep't of Natural Resources*, 459 Mich 659, 665-666; 593 NW2d 534 (1999).[20] Perhaps most significantly, these provisions enable localities to regulate land use to meet the state's needs for natural resources. In our judgment, it follows that the Legislature

---

[20] In *Bevan v Brandon Twp*, 438 Mich 385, 398; 475 NW2d 37 (1991), this Court recognized that there is a broad array of land uses that a local government may regulate:

> While all of the legitimate state interests that may justify zoning have not been identified, the United States Supreme Court has indicated "that a broad range of governmental purposes and regulations satisfies these requirements." *Nollan v California Coastal Comm* [483 US 825, 834-835; 107 S Ct 3141; 97 L Ed 2d 677 (1987)].

intended that localities would be responsible for regulating the extraction of natural resources within their boundaries.

Additionally, the ZEA specifically limits localities' powers. For instance, the exclusionary zoning provision, MCL 125.297a, now MCL 125.3207, applies to all land uses within the community and precludes the zoning power from completely prohibiting a lawful land use where there is a demonstrated need for that land use within a jurisdiction. The ZEA also imposes other limitations. For example, there is a provision that limits the regulation of adult foster care facilities and family or group child-care homes. MCL 125.3206. Another provision sets forth a detailed approach to protect and preserve open spaces. MCL 125.3506. There is also a provision that protects agricultural land by allowing for the creation of a development rights ordinance. MCL 125.3507 *et seq*. Notably, the ZEA specifically excludes areas that the Legislature intended to regulate through other means. MCL 125.3205(1), for example, explicitly makes local zoning subject to the Electric Transmission Line Certification Act, MCL 460.561 *et seq*. That same provision specifically limits a county or township from regulating or controlling "the drilling, completion, or operation of oil or gas wells or other wells drilled for oil or gas exploration purposes," and also limits them from exercising jurisdiction over "the issuance of permits for the location, drilling, completion, operation, or abandonment of such wells." MCL 125.3205(2). Notably, there are no similar provisions that limit or exempt the exercise of local zoning power over other natural resources, such as gravel.

Thus, the ZEA is a comprehensive law that empowers localities to zone, sets forth in detail the development of zoning plans within a community, and specifically limits the zoning power in particular circumstances. The Legislature clearly intended for localities to regulate land uses, including the extraction of natural resources other than oil and gas. Under the ZEA, a locality may not totally prohibit a lawful land use within its jurisdiction, providing that there is a demonstrated need for that land use and there is an appropriate location. By contrast, the "no very serious consequences" rule allows natural resources extraction without consideration of these same factors. Under the ZEA, the Legislature requires localities to establish comprehensive land-use plans. The "no very serious consequences" rule, however, dilutes this achievement by overlaying on the law a judicially created case-by-case rule that is incompatible with the idea of a sustained and comprehensive long-term plan. And unlike the ZEA, the "no very serious consequences" rule dictates that a single consideration, the extraction of natural resources, will always carry the highest priority in the land-use process, no matter how this is viewed by the community in which the use occurs, and no matter how thorough and how nuanced the local land-use plan is in reconciling the full range of relevant factors and interests. The *Silva* rule creates a "one-size fits all" policy in a realm in which it is especially important that the unique circumstances of each locality be carefully assessed. In at least these ways, the "no very serious consequences" rule is, in our judgment, incompatible with the ZEA, and accordingly it is superseded by the ZEA.

28

## IV. CONCLUSION

The "no very serious consequences" rule is not a "species" of the reasonableness test and thus is not a requirement of the constitution's Due Process Clause; its adoption violates the constitution's separation of powers; and, by the enactment of the exclusionary zoning provision of the ZEA, the Legislature has superseded the rule. The constitution only requires that a zoning ordinance be reasonable, regardless of whether the ordinance does or does not regulate the extraction of natural resources. Moreover, an ordinance is presumed to be reasonable, and the burden is upon the party challenging the ordinance to overcome this presumption by demonstrating that there is no reasonable governmental interest being advanced.

In this case, both the trial court and the Court of Appeals analyzed the zoning ordinance through the prism of the "no very serious consequences" rule, rather than the "reasonableness" test. We therefore reverse the judgments of the Court of Appeals and the trial court and remand to the trial court for further proceedings not inconsistent with this opinion.

CORRIGAN, YOUNG, and HATHAWAY, JJ., concurred with MARKMAN, J.

# STATE OF MICHIGAN

## SUPREME COURT

EDITH KYSER,

       Plaintiff-Appellee,

v                                         No. 136680

KASSON TOWNSHIP,

       Defendant-Appellant.

_____

KELLY, C.J. (*dissenting*).

The "very serious consequences" test derives from constitutional due process considerations. I believe that it does not violate the constitutional separation of powers principle and has not been superseded by the exclusionary zoning statute.[1] Accordingly, I would affirm the judgment of the Court of Appeals.

## THE VERY SERIOUS CONSEQUENCES TEST DERIVES FROM

## CONSTITUTIONAL DUE PROCESS CONCERNS

The very serious consequences test originated over 80 years ago in *City of North Muskegon v Miller*.[2] This Court observed that "courts have particularly stressed the importance of not destroying or withholding the right to secure oil, gravel, or mineral from one's property, through zoning ordinances, unless some very serious consequences

---

[1] MCL 125.297a.

[2] 249 Mich 52; 227 NW 743 (1929).

will follow therefrom."[3]  Recognizing that restrictions on mineral extraction differ from other land-use restrictions, this Court went on to state that "'[l]egislatures may not, under the guise of the police power, impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities.'"[4]

Nearly 30 years later, this Court made clear that the very serious consequences test is a constitutional test for reasonableness that must be applied when the extraction of minerals is involved.  In *Certain-teed Prod Corp v Paris Twp*, we stated that if an ordinance is applied to mining and fails to meet the very serious consequences test, "the result must be a judicial determination of *constitutional unreasonableness*."[5]  *Certain-teed* solidified the test as a test of constitutional dimensions in Michigan.

In *Silva v Ada Twp*, this Court reaffirmed that *Miller* and *Certain-teed* state the appropriate constitutional standard for determining the reasonableness of zoning that prevents the extraction of valuable minerals.[6]  *Silva* recognized that the very serious consequences test is important because the prevention of mineral extraction has a uniquely confiscatory character.  Also, the public has a particular interest in having valuable minerals.  The Court observed that "[n]atural resources can only be extracted

---

[3] *Id.* at 57.

[4] *Id.* at 58 (citation omitted).

[5] *Certain-teed Prod Corp v Paris Twp*, 351 Mich 434, 467; 88 NW2d 705 (1958) (emphasis added).

[6] *Silva v Ada Twp*, 416 Mich 153, 159; 330 NW2d 663 (1982).

2

from the place where they are located and found."[7]  In addition to the necessity of

protecting individual property rights, this Court pointed to the public interest in natural

resource development as a justification for the higher standard: "Preventing the extraction

of natural resources harms the interests of the public as well as those of the property

owner by making natural resources more expensive."[8]

This Court further explained the substantive due process concerns for zoning

regulations in *Kropf v City of Sterling Hts*:

> A plaintiff-citizen may be denied substantive due process by the city
> or municipality by the enactment of legislation, in this case a zoning
> ordinance, which has, in the final analysis, no reasonable basis for its very
> existence.  The power of the city to enact ordinances is not absolute.  It has
> been given power by the State of Michigan to zone and regulate land use
> within its boundaries so that the inherent police powers of the state may be
> more effectively implemented on the local level.  But the state cannot
> confer upon the local unit of government that which it does not have.  For
> the state itself to legislate in a manner that affects the individual right of its
> citizens, the state must show that it has a sufficient interest in protecting or
> implementing the common good, via its police powers, that such private
> interests must give way to this higher interest.  *Different degrees of state
> interest are required by the courts, depending upon the type of private
> interest which is being curtailed.*[9]

It is significant that in 1963, before this Court's decision in *Silva*, Michigan's

citizens adopted a new constitution that affirmed the importance of the development of

---

[7] *Id.* at 159.

[8] *Id.* at 160.

[9] *Kropf v City of Sterling Hts*, 391 Mich 139, 157-158; 215 NW2d 179 (1974)
(emphasis added).  Although the test used in *Kropf* was based on reasonableness, it was
framed in terms of substantive due process.  *Kropf* did not consider the very serious
consequences test.  *Silva*, 416 Mich at 161.

natural resources: "The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people."[10]

The majority opinion dismisses over 80 years of precedent holding that minerals on property implicate unique due process concerns. It reverses course, observing that there is simply "no basis in the zoning laws of our state, or in our constitution, for judicially adopting such a distinction."

To the contrary, the power of courts to interpret and enforce constitutional rights and policies by placing limits on the government's exercise of its police power is well established.[11] The majority opinion fails to adequately explain on what grounds it overrules the line of cases since *Miller* that held that the very serious consequence test derives from the Due Process Clause of the constitution.[12] It fails to follow established precedent, concluding instead that the test is not a constitutional requirement. In so

---

[10] Const 1963, art 4, § 52. This section goes on to direct the Legislature to protect the state's natural resources. This command does not diminish the declaration that the conservation and development of natural resources is of paramount importance to the people of the state of Michigan. The special status that the constitution gives natural resources only strengthens *Silva*'s conclusion that a higher standard applies to mineral extraction because natural resources are different from other types of private interests.

[11] *Delta Charter Twp v Dinolfo*, 419 Mich 253, 273; 351 NW2d 831 (1984) (stating that "line drawing is a legislative function, but certainly there can be no argument against the well-understood rule of law that the task of deciding whether the line itself is reasonably related to the object of the line drawing is a judicial function").

[12] Const 1963, art 1, § 17 ("No person shall be . . . deprived of life, liberty or property, without due process of law.").

4

doing, it ignores the constitutional underpinnings of the test set forth in *Silva* and the fact that the Due Process Clause is the bedrock upon which the test was built.

Notably, the majority opinion does not adequately consider whether the doctrine of stare decisis warrants overruling the constitutional underpinnings of the *Silva* opinion. Such consideration is essential. If the very serious consequences test is derived from the Due Process Clause, as this Court has continuously held, then the Legislature does not have the power to displace the test.[13]

This Court should not disregard stare decisis by gutting the long line of constitutional jurisprudence behind the very serious consequences test and leave only the bare shell of *Silva* intact. This would eviscerate the whole concept behind stare decisis by selectively overruling parts of the case, leaving the rest and declaring no harm done.[14]

---

[13] See *People v Salsbury*, 134 Mich 537, 546; 96 NW 936 (1903) (explaining that the Legislature cannot instruct a court on how to interpret the constitution because the judicial power, which includes the power to interpet the constitution, is held exclusively by the courts); See also *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 614; 684 NW2d 800 (2004) (stating that the judicial branch is the final authority to "accord meaning to the language of the constitution . . . ."); *Dickerson v United States*, 530 US 428, 437; 120 S Ct 2326; 147 L Ed 2d 405 (2000) (holding that "Congress may not legislatively supersede our decisions interpreting and applying the Constitution . . . .").

[14] See *People v Gardner*, 482 Mich 41, 85; 753 NW2d 78 (2008) (KELLY, J., dissenting) (explaining that the purpose behind stare decisis is to promote predictability "by making it more difficult to apply the doctrine selectively."); *Paige v Sterling Hts*, 476 Mich 495, 533; 720 NW2d 219 (2006) (opinion by CAVANAGH, J.) (stating that "'absent the rarest circumstances, [the Court] should remain faithful to established precedent'") (emphasis omitted); *Gardner*, 482 Mich at 85 (KELLY, J., dissenting) (holding that there must be "some special justification" for overruling earlier precedent, and this requires more than a conviction that the challenged precedent was wrongly decided).

This is also contrary to the requirements of *Robinson v Detroit* and the most fundamental principles of stare decisis.[15] Even if I would have reached a different conclusion had I helped decide *Silva* and considered the test for the first time, I am now bound to follow and apply it.[16]

The majority neglects to show how *Silva* defies practical workability. It fails to consider whether overturning it will work an undue hardship on those who have relied on it. Rather, without explanation, it states that overruling it will not cause "'practical, real-world dislocations.'" (Citation omitted.) I would not so casually discard over 80 years of jurisprudence. If the majority is intent on sending *Miller* and its progeny to the grave, it should give them a proper burial. Having been provided no substantial justification for overruling this precedent, I would affirm this Court's previous decisions holding that the very serious consequences test derives from constitutional due process concerns.

---

[15] *Robinson v Detroit*, 462 Mich 439, 464-465; 613 NW2d 307 (2000). *Robinson* requires this Court to examine a number of things before overruling precedent. First, it must determine that an earlier decision was wrongly decided. Next, it must consider (1) whether the decisions defies practical workability, (2) whether reliance interests would work an undue hardship if the decision were overturned, and (3) whether changes in the law or facts no longer justify the decision.

See also *Petersen v Magna Corp*, 484 Mich 300; 773 NW2d 564 (2009). (opinion by KELLY, J.) (extensively discussing the doctrine of stare decisis and advocating for a test giving greater deference to past precedent). I remain committed to the stare decisis factors I pronounced in *Petersen*, and I believe that those factors should be adopted by this Court. Nevertheless, the stare decisis test enunciated in *Robinson* is currently recognized by a majority of the Court.

[16] See *Hubbard v United States*, 514 US 695, 716; 115 S Ct 1754; 131 L Ed 2d 779 (1995) (Scalia, J., concurring) (explaining that a past decision should not be overruled without more grounds than that it was wrongly decided).

6

THE VERY SERIOUS CONSEQUENCES TEST DOES NOT VIOLATE

THE SEPARATION OF POWERS PRINCIPLE

I disagree with the majority that the very serious consequences test violates the principle of separation of powers. Essential to this analysis is whether the test is derived from constitutional due process, which I discussed in the previous section. Because this Court held previously that it does, and because I believe this holding should not be disturbed, it follows that the principle of separation of powers is not violated.

Legislative power is not absolute and is limited by the constitution.[17] The Michigan Constitution cautions that "No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."[18]

I agree with the majority that zoning involves the exercise of a legislative function. Zoning is an exercise of the state's police power, and the government has the authority to restrict private conduct to promote public health, safety, morals, or the general welfare.[19]

---

[17] *Marbury v Madison*, 5 US 137, 176; 2 L Ed 60 (1803) ("[t]he powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.").

[18] Const 1963, art 3, § 2.

[19] 1 Rathkopf's The Law of Zoning and Planning (4th ed), § 1.101[2], p 1-6; *Village of Euclid v Ambler Realty Co*, 272 US 365, 387; 47 S Ct 114; 71 L Ed 303 (1926) (holding that zoning laws "must find their justification in some aspect of the police power, asserted for the public welfare").

However, the Legislature may not pass a zoning ordinance that does not comport with the requirements of substantive due process.[20]

If the constitution and a legislative act conflict, the constitution must govern. It is within the inherent power of the judiciary to determine whether there is such a conflict. As explained in *Marbury v Madison*:

> It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.
>
> So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.
>
> If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply.[21]

These principles have been embraced in Michigan since the beginning of its system of government. It is this Court's duty to uphold the constitution above any legislative acts.[22] Although the Legislative branch can exercise the police power, it cannot also define the limits of that power. As Justice COOLEY explained:

---

[20] *Silva*, 416 Mich at 157-158.

[21] *Marbury*, 5 US at 177-178.

[22] *People ex rel Sutherland v Governor*, 29 Mich 320, 324-325 (1874) (explaining that the courts must determine whether a legislative act conflicts with the constitution, and if it does, the constitution prevails).

8

It has long been a maxim in this country that the Legislature cannot dictate to the courts what their judgments shall be, or set aside or alter such judgments after they have been rendered. If it could, constitutional liberty would cease to exist . . . .[23]

Only the courts can define the contours of constitutional rights. Because this Court has consistently found the very serious consequences test to be grounded in the Due Process Clause of the constitution, the test does not violate the separation of powers principle.

THE EXCLUSIONARY ZONING STATUTE HAS NOT SUPERSEDED

THE VERY SERIOUS CONSEQUENCES TEST

Even assuming that the very serious consequences test were not constitutional in nature and that the Legislature had the authority to displace it, I do not believe that it has done so. I disagree with the majority that the test was superseded by the exclusionary zoning statute. That statute was part of the Township Zoning Act (TZA).[24] It is now recodified in nearly identical form as MCL 125.3207 under the Zoning Enabling Act (ZEA).[25]

Three things compel me to conclude that the ZEA does not displace the very serious consequences test. First, both the TZA and the ZEA are silent regarding the test,

---

[23] *Id.* at 325-326.

[24] MCL 125.271 *et seq.*

[25] MCL 125.3207 prohibits municipalities from enacting any zoning ordinance "totally prohibiting" a given land use if a "demonstrated need" exists for that use, unless either: (1) there is no location where the use may be "appropriately located"; or (2) the use is "unlawful."

and there is every reason to believe that the Legislature was aware of the test when it passed the statutes. Whether a statute "preempts, changes, or amends the common law is a question of legislative intent," and the Legislature "is presumed to know of the existence of the common law when it acts."[26] We have repeatedly stated that "'statutes in derogation of the common law must be strictly construed, and will not be extended by implication to abrogate established rules of common law.'"[27]

By the time the Legislature passed the exclusionary zoning statute in 1979, the very serious consequences test had already been set forth in *Miller* and affirmed in *Certain-teed*. Yet, the TZA makes no mention of the test, nor does it state a different standard for gravel extraction; rather, it is completely silent on the issue.

Likewise, when the ZEA was enacted in 2006, it made no mention of the very serious consequences test. If the Legislature wanted either statute to replace the test, why did it not indicate that, given that it was presumed to know the common law? The courts must construe statutes that are in derogation of the common law narrowly. Hence, we should conclude that the Legislature's failure to specifically address the very serious consequences test or enact another standard for gravel extraction indicates its intention not to displace the rule.

---

[26] *Wold Architects & Engineers v Strat*, 474 Mich 223, 233-234; 713 NW2d 750 (2006).

[27] *Energetics, Ltd v Whitmill*, 442 Mich 38, 51 n 20; 497 NW2d 497 (1993), quoting *Rusinek v Schultz, Snyder & Steele Lumber Co*, 411 Mich 502, 508; 309 NW2d 163 (1981) (citations omitted).

Second, the Legislature's acquiescence implies that it has accepted the test. In the 27 years between the passage of the TZA and ZEA, courts across Michigan have repeatedly applied the test in relative harmony with the statutes.[28] Despite this ongoing application and use of the test, the Legislature has not acted to invalidate it. If the Legislature had wanted to alter it, there was ample opportunity, especially in 2006 with the enactment of the ZEA.

The test has worked in this state for a long time now. I find it difficult to conclude that the Legislature intended to displace it merely by implication when it enacted the TZA or the ZEA. Because the Legislature did not indicate in either statute that it was displacing the test, it appears to have acquiesced in it.[29]

Third, the very serious consequences test and the exclusionary zoning statute cover different matters. The very serious consequences test applies to cases in which the alleged harm affects a specific parcel. In the present case, the test is applicable to plaintiff's parcel of land. In contrast, the harm alleged in a claim under the exclusionary zoning statute affects an entire geographic area.

---

[28] See, e.g., *Compton Sand & Gravel Co v Dryden Twp*, 125 Mich App 383; 336 NW2d 810 (1983); *American Aggregates Corp v Highland Twp*, 151 Mich App 37; 390 NW2d 192 (1986); *Velting v Cascade Charter Twp*, unpublished opinion per curiam of the Court of Appeals, issued May 5, 2005 (Docket No. 250946); *France Stone Co, Inc v Monroe Charter Twp*, 790 F Supp 707 (ED Mich, 1992).

[29] See *Karaczewski v Farbman Stein & Co*, 478 Mich 28, 53; 732 NW2d 56 (2007) (KELLY, J., dissenting) (listing a long line of cases where this Court has used legislative acquiescence and explaining that "legislative acquiescence is one of the many judicial tools a court properly uses when attempting to effectuate the intent of the Legislature").

Notably, it does not appear from the act's language that a plaintiff who prevails under the exclusionary zoning statute is necessarily entitled to rezoning of a specific parcel. This is because the harm is to a geographic area. Because the statute and the rule address different types of challenges to zoning ordinances and can be applied in harmony, there is no basis for concluding that one supersedes the other.

CONCLUSION

The very serious consequences test is an ingrained part of Michigan jurisprudence. It was born over 80 years ago from due process principles. While there are certainly valid policy considerations for and against retaining it, this Court should not discard it without better cause than has been shown in this proceeding.

Moreover, I believe that the Legislature is not empowered to invalidate the test, and nothing clearly indicates that the Legislature has tried to do so. Accordingly, I would affirm the judgment of the Court of Appeals.

CAVANAGH, J., concurred with KELLY, C.J.

WEAVER, J., did not participate in this case because she has a past and current relationship with Kasson Township Supervisor Fred Lanham and his family.

12