*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NORTHSTAR AGGREGATES, LLC,

      Plaintiff-Appellant,

and

USA EARTHWORKS, LLC,

      Plaintiff,

v

WATSON TOWNSHIP,

      Defendant,

and

WATSON TOWNSHIP PLANNING
COMMISSION,

      Defendant-Appellee.

UNPUBLISHED
July 27, 2023

No. 363567
Allegan Circuit Court
LC No. 2021-064894-AA

Before: RIORDAN, P.J., and MARKEY and YATES, JJ.

PER CURIAM.

Plaintiffs, Northstar Aggregates, LLC, and USA Earthworks, LLC, filed an application with defendant, Watson Township Planning Commission (WTPC), seeking a special-use permit (SUP) to operate a sand and gravel mining business on certain real property located within the boundaries of defendant, Watson Township (the township), that was zoned low-density residential. The WTPC denied the application, and Northstar and USA Earthworks, in a single document, filed a claim of appeal and a civil complaint in the circuit court challenging the denial. The circuit court, sitting solely as an appellate body after the complaint was dismissed by stipulation, affirmed the

-1-

decision of the WTPC. Northstar appeals that ruling to us.[1] Because we conclude that the circuit court clearly erred with respect to the issue of "need" and engaged in an inadequate examination on the matter of "very serious consequences," we reverse and remand for further proceedings.

## I. STATUTORY AND ORDINAL FRAMEWORK

To give context to our discussion of the facts and procedural history of the case, we begin with an examination of the statutory and ordinal framework that play a role in analyzing the issues presented in this case. The litigation implicated the Michigan Zoning Enabling Act (MZEA), MCL 125.3101 *et seq.* In *Saugatuck Dunes Coastal Alliance v Saugatuck Twp*, 509 Mich 561, 577; 983 NW2d 798 (2022), our Supreme Court observed:

> Local governments have no inherent power to regulate land use, but the Legislature has empowered local governments to zone for the broad purposes identified in the MZEA at MCL 125.3201(1). The MZEA was enacted in 2006 and consolidated three zoning statutes for cities and villages, for townships, and for counties. In addition to setting the parameters of local zoning power, the MZEA also established processes and standards for when, how, and who can appeal official decisions related to the regulation and development of land. [Quotation marks and citations omitted.]

The governing statute in this case is MCL 125.3205, which addresses zoning and the regulation of drilling and mining operations, and the statute provides, in relevant part:

> (3) An ordinance shall not prevent the extraction, by mining, of valuable natural resources from any property unless very serious consequences would result from the extraction of those natural resources. Natural resources shall be considered valuable for the purposes of this section if a person, by extracting the natural resources, can receive revenue and reasonably expect to operate at a profit.

> (4) A person challenging a zoning decision under subsection (3) has the initial burden of showing that there are valuable natural resources located on the relevant property, *that there is a **need** for the natural resources by the person or in the market served by the person, and that **no very serious consequences** would result from the extraction, by mining, of the natural resources.*

> (5) In determining under this section whether very serious consequences would result from the extraction, by mining, of natural resources, the standards set

---

[1] Although their appellate brief identifies Northstar and USA Earthworks as joint appellants, the claim of appeal solely listed Northstar as the appellant. This fact does not alter our analysis or impact our ruling.

forth in *Silva v Ada Township*, 416 Mich 153[; 330 NW2d 663](1982)[2], shall be applied and all of the following factors may be considered, if applicable:

(a) The relationship of extraction and associated activities with existing land uses.

(b) The impact on existing land uses in the vicinity of the property.

(c) The impact on property values in the vicinity of the property and along the proposed hauling route serving the property, based on credible evidence.

---

[2] In *Silva*, 416 Mich at 156, our Supreme Court reaffirmed the rule "that zoning regulations which prevent the extraction of natural resources are invalid unless 'very serious consequences' will result from the proposed extraction." Subsequently, the Supreme Court in *Kyser v Kasson Twp*, 486 Mich 514, 517; 786 NW2d 543 (2010), held that the rule of *Silva* was not a constitutional requirement, that it, in fact, violated the constitutional separation of powers, and that the rule was superseded by the exclusionary zoning provision in MCL 125.3207. Shortly thereafter, the Legislature, pursuant to 2011 PA 113, amended MCL 125.3205 to add the "very serious consequences" language and the citation of *Silva*, effectively resurrecting *Silva* and rejecting *Kyser*. With respect to the standards set forth in *Silva,* the *Silva* Court stated:

Natural resources can only be extracted from the place where they are located and found. Preventing the mining of natural resources located at a particular site prevents all use of those natural resources. . . . .

Preventing the extraction of natural resources harms the interests of the public as well as those of the property owner by making natural resources more expensive. Because the cost of transporting some natural resources (e.g., gravel) may be a significant factor, locally obtained resources may be less expensive than those which must be transported long distances. . . . .

In most cases, where natural resources are found the land will be suited for some other use and can reasonably be devoted to that use. Unless a higher standard is required, natural resources could be extracted only with the consent of local authorities or in the rare case where the land cannot be reasonably used in some other manner. The public interest of the citizens of this state who do not reside in the community where natural resources are located in the development and use of natural resources requires closer scrutiny of local zoning regulations which prevent development. In this connection, we note that extraction of natural resources is frequently a temporary use of the land and that the land can often be restored for other uses and appropriate assurances with adequate security can properly be demanded as a precondition to the commencement of extraction operations. [*Silva*, 416 Mich at 159-161.]

(d) The impact on pedestrian and traffic safety in the vicinity of the property and along the proposed hauling route serving the property.

(e) The impact on other identifiable health, safety, and welfare interests in the local unit of government.

(f) The overall public interest in the extraction of the specific natural resources on the property. [Emphasis added.]

Analyses of "need" and "no very serious consequences" are at the heart of this litigation and appeal. In this case, the WTPC also took into consideration a couple of provisions in the Watson Township Zoning Ordinance (ZO). The WTPC examined ZO, § 15.02, which provides as follows:

Special Land Uses are not permitted to be engaged in within the particular zone in which they are listed unless and until the Township Planning Commission, in its discretion, is satisfied that the use under the conditions, controls, limitations, circumstances and safeguards proposed and imposed by the Commission, will:

(a) be compatible with the other uses expressly permitted within the district, with the natural environment and

(b) be consistent with the capacities of public services and facilities affected by-the land use;

(c) not be detrimental or injurious to the use or development of adjacent properties or to the occupants thereof or to the general neighborhood;

(d) promote the public health, safety, morals and general welfare of the community;

(e) encourage the use of lands in accordance with their character and adaptability;

(f) the standards required by the Commission for the allowance of this Special Land Use can and will in its judgment, be met at all times by the applicant or its assigns.

The burden of proof of facts which might establish a right to a Special Land Use Permit under the general standards and any specific standards contained herein shall be upon the applicant.

The WTPC also took into consideration ZO, § 17.07,[3] which pertained to requests for special exception permits for earth removal, quarrying, gravel processing, mining, and associated mineral extraction, and which provided, in relevant part:

(c) Following [a] hearing, said Planning Commission shall grant or deny the application and set forth its reasons for its decision. Such recommendation shall be based upon the criteria set forth within the Ordinance and shall be based, in addition, on a consideration of the following:

(1) the most advantageous use of the land, resources and property

(2) the character of the area in question and its peculiar suitability, if any, for particular uses

(3) conservation of property values, as well as natural resources and the general and appropriate trend and character of development in the subject area

(4) the protection and preservation of the general health, safety and welfare of the township

(5) the scarcity or value of the minerals sought to be mined as compared with the effect upon the adjacent community of the proposed operations

(6) whether or not the operations were previously in existence prior to the adoption of the text provision concerning the same and the extent and character of such previous operations

(7) in making any decision, the Planning Commission shall have the right and authority to impose such additional conditions and safeguards as it deems necessary for the protection of the health, safety and general welfare of the neighborhood and of the adjoining residents and property owners. . . . .

We note that the WTPC also referenced at times the township's Master Plan, which revealed that the property at issue was designated for future residential cluster development. With the statutory and ordinal framework in place, we now commence our review of the WTPC and circuit court proceedings.

## II. WTPC PROCEEDINGS

---

[3] After the SUP application was submitted in October 2020, the township amended ZO, § 17.01 *et seq.*, in April 2021, including § 17.07. Chapter 17 addresses mining operations. As reflected in meeting minutes that we discuss *infra*, the WTPC applied the pre-amendment version of ZO, § 17.07; therefore, we quote the language of that earlier version.

## A. THE APPLICATION

By document dated October 5, 2020, Northstar[4] applied for a SUP to commence a mineral mining operation in an area zoned low-density residential. The property consisted of 77.74 acres, 44.49 of which were to be mined if approval was granted. Accompanying the application was an extensive statement in support of the application. The prospective mining operation was described as follows:

> The proposed aggregate extraction operation would yield aggregate material to be used by USA [Earthworks] in its construction business and supply materials to create asphalt material for such uses as parking lots, driveways, subdivision roads and similar uses. The aggregate would also be available for use for highway, road and development projects. The aggregate extraction operation would yield approximately 700,000 to 800,000 tons of material as the expected yield. Of that expected yield, approximately 95% of it would be used by the Owner/Operator in their own business operations. The remainder would be used primarily as road gravel for job sites.

In the statement, Northstar discussed the specific operational aspects of the proposed mining business. The statement also addressed the following subjects: road access; required truck-turning movements; estimated increase in traffic generated by the operation; hours of operation; estimated end or completion date of operation under normal market conditions (10-15 years); auditory mitigation; visual impact and screening; fencing; earthen berms; restoration of property at end date; public service and utility requirements; structures; wetland and environmental determinations; site barriers; property value impacts; and noise and vibration. In addressing the subjects, Northstar proffered information favorable to the commencement of a mining operation. Northstar asserted that its studies, reports, and analyses demonstrated that "there will be no serious adverse impacts arising from the proposed project."

The statement noted that "the mining operation will use only approximately one and a one half (1.5) mile of local roads (117[th] Avenue) within the Township." Northstar discussed the character of the area surrounding the project and the suitability of the land for mining. The statement reflected that there were two houses adjacent to the site and four homes across the street from Northstar's property. The statement also contained a "need" analysis, and because "need" is critical to resolving this appeal, we quote most of Northstar's argument, which provided:

> [The minerals are] of great value to the Applicant/Operator for the reason that such materials are a constant resource need in the Applicant's business. The ability to excavate and utilize materials from this site would result in a significant cost savings to its regular business operations, would provide a constant source of a needed resource and would support the continuation of its business and the jobs that this business provides. The cost savings resulting from this ready source of

---

[4] For ease of reference, and unless otherwise indicated, we shall refer solely to Northstar for the remainder of this opinion even though USA Earthworks remained a party throughout the litigation.

materials would permit the expansion of the Applicant's business, the creation of additional jobs, and provide ongoing support for the viability of the Operator. The Operator has, in the past, had to turn down jobs because there was not a readily available source of material to meet its needs and further, even in the event that such resources are available, the cost savings alone justify the Applicant's need. In addition, the costs savings would be passed on in the local market making operations much more competitive for the Applicants. Due to the immense competition for aggregate reserves, this operation is needed in order to keep the flow of aggregate materials necessary to support the company's operations and to keep it at full employment in this area. The mining operation would fulfill a great portion of that need.

> Moreover, the proposed use is beneficial both socially and economically, in terms of maintaining business activity and employment within Allegan County and is designed to minimize the impact of the surrounding area by being situated in a relatively isolated location, conducting mining and smaller isolated phases and with the special use to be consistent with the mineral extraction use which is proposed.

Northstar further indicated its belief "that the design of [the] proposed mining operation, the construction of extensive berms as screening as needed around the site, and the consultants' reports, all provide assurance of a lack of very serious consequences in conjunction with [the] proposed mineral extraction operation."[5]

## B. DOCUMENTARY SUBMISSIONS

In the WTPC proceedings, numerous reports, studies, and analyses were placed into the record. Northstar submitted an impact study by James A. Van Stensel, Jr., a certified general real estate appraiser, who reached the following conclusion:

> It is my conclusion that the future mineral mining operation will not negatively impact the marketability of properties adjoining or within close proximity to this type of operation. Furthermore, I have concluded that it does not negatively impact the market value of single-family residential properties or vacant land within close proximity to this type of operation. This is predicated on the assumption that the hours of aggregate mining operation and removal are normal operating hours on weekdays and Saturdays for this type of operation. This conclusion assumes that there is a reasonable termination date for the aggregate mining operation with reclamation after each phase and that all precautions

---

[5] After the township amended Chapter 17 of its ZO in April 2021 relative to mining operations, Northstar submitted a revised SUP application in July 2021. But it did not significantly alter any portions that we discussed above. With respect to the planned mining operation, Northstar now added that the aggregate would be used within a six-county service area consisting of Allegan, Barry, Kent, Kalamazoo, Ottawa, and Van Buren Counties. Northstar also attached a Fugitive Dust Control Plan.

necessary will be made to prevent soil erosion and or other damage to adjoining property owners.

Northstar also introduced a wetlands study and determination by King & MacGregor Environmental, Inc., which identified wetland areas on the property but did not reveal any problematic impacts from a mining operation. Additionally, Northstar tendered a traffic impact study prepared by Progressive AE, which provided as follows:

Based on the analyses performed, Progressive AE offers the following regarding future traffic operations along the proposed mining operation route to serve the Northstar Aggregates, LLC mineral mining development:

1.      Adequate vehicle capacity exists to accommodate the additional 20 truck round trips expected per business day generated from the proposed mining operation along the entire route including M-222, 12th Street, and 117th Avenue.

2.      The condition of 117th Avenue and 12th Street is in a fair to poor existing condition which meets safety, capacity and geometric standards to support trucking operations. Additional maintenance efforts may be needed to maintain the existing pavement condition after the trucking operation commences.

3.      The existing route has had very few crashes in the last 5 years. The proposed addition of 20 truck round trips daily is insignificant throughout the day and traffic crashes are expected to remain similar to the previous 5 years.

Northstar presented a commercial driveway permit for the proposed gravel pit entrance that was issued by the Allegan County Road Commission. Northstar further proffered a letter from the Director of Operations for Hopkins Public Schools, who noted an awareness of the SUP application and stated that "[w]hile this gravel pit is on a road that is also traveled by Bus #5 of our school transportation route, we do not foresee any problems that would impede on safety or the normal course of operation for that route." Northstar additionally submitted a policy paper authored by George S. Ford, PhD, and R. Alan Seals, PhD, titled *Quarry Operations and Property Values: Revisiting Old and Investigating New Empirical Evidence* (March 2018), in which the authors concluded that "[w]e find no compelling statistical evidence that either the anticipation of, or the ongoing operation of, rock quarries negatively impact home prices" and that "[i]n light of the evidence presented here and in prior research, the expectation must be that there will be little to no effect on home prices and, if anything, that effect may be positive." Northstar also hired Valbridge Property Advisors to perform a market study of the impact of the proposed sand and gravel mining operation on surrounding properties. The Valbridge study resulted in the following opinion:

Based on the data collected and analyzed, there is very little evidence to support a conclusion that residential property values will experience negative value impact as a result of proximity to an open excavation sand and gravel extraction site located proximal to residential property. In fact, the bulk of the data demonstrates no change in values or, in some cases, an increase in values.

The WTPC made multiple requests to Northstar to provide various information in furtherance of the SUP application. The WTPC submitted, ultimately, a total of 82 questions to Northstar, many with subparts, and Northstar provided substantive answers to most of the questions. The answers were favorable to granting the SUP application. The WTPC also asked Northstar to provide information concerning its interpretation of the language "need for . . . natural resources," as used in MCL 125.3205(4), and Northstar prepared and tendered a 13-page brief to the WTPC. Northstar supplied the WTPC with an affidavit by Matt Double, who averred that he and his wife co-owned Northstar and USA Earthworks, the proposed operator of the mine. Double averred that he "has been a contractor for more than 25 years and is engaged in business requiring the use of substantial amounts of sand and gravel materials." Double indicated that as a contractor he was "involved in the business of excavating, including government projects, assisted living centers, water main projects, road building and rebuilding, installation of pipe and water lines, preparation and installation of road base, [and] underground retention systems requiring stone." Double claimed that "USA Earthworks is a consistent user of sand and gravel products and requires 50,000-80,000 tons of such materials on an annual basis to sustain its business."

Pertinent to the language in MCL 125.3205(4), querying whether "there is a need for the natural resources by the [applicant] or in the market served by the [applicant]," Double averred as follows:

> Your affiant states that due to the increasing demands and consequent shortages of sand and gravel materials, the cost to purchase such materials have increased an estimated 25-35 percent on the average in the past five (5) years. . . . During that same period, transportation costs including fuel, parts, tires, equipment and maintenance have doubled or more in the past three (3) years so that having to travel further and further from his own operating area to obtain sand and gravel has at times eliminated USA Earthworks as a competitor in bidding due to the need to cover such prices in its bidding for those jobs. USA Earthworks needs a ready supply of sand and gravel and its own source of sand and gravel to stay competitive in the marketplace.

> * * *

> Your affiant states that USA Earthworks cannot compete with competitors in the marketplace who own their own supplies and that even now the need to go further away from projects to obtain materials at higher prices and higher transportation costs has taken away the ability in many cases to make competitive winning bids for projects.

> * * *

> Your affiant states upon information and belief that sand and gravel supplies will become increasingly scarce in the Southwest Michigan area over the next ten (10) to twelve (12) years to a point that no ready access to sand and gravel supplies which are not owned by the applicant are likely to be available. (See MDOT Report attached).

Your affiant states that the sand and gravel from this mining operation is a valuable natural resource, that the operation will produce 700,000 tons to 800,000 tons of sand and gravel materials, that both companies would profit from the use of such materials, and that the sand and gravel is needed by Northstar Aggregates and USA Earthworks to be able to compete in the marketplace.

Northstar submitted an aggregate price list covering several area sand and gravel companies, and it showed increases in the price of aggregate from 2017 to 2021 that ranged from 18.82% to 40.34%.

The zoning administrator for the township, Lori Castello, prepared a memorandum that contained her review of the various criteria or factors in ZO, § 17.01 *et seq.*, and her application of known facts or information regarding Northstar's SUP request to each ordinal factor. Castello's overall evaluation was neither supportive nor critical of Northstar's application, but on a number of the factors, she believed that the WTPC needed to obtain additional information.

The WTPC, and ultimately the circuit court, did rely on a 2006 report prepared by George Erickcek of the W.E. Upjohn Institute that was titled: *An Assessment of the Economic Impact of the Proposed Stoneco Gravel Mine Operation on Richland Township.* Erickcek wrote:

This report, which was completed at the request of the Richland Township Planning Commission, provides an estimation of the economic impact of the proposed Stoneco Gravel Mine Operation on Richland Township. The following impacts are assessed in this study:

1. The potential impact on residential property values in Richland Township.

2. The potential employment impact of the proposed gravel mine on the area's economy.

In addition, we carefully reviewed the economic impact reports provided by Stoneco for consideration. In the preparation of this impact analysis we used nationally-recognized modeling techniques that are the standard for academic research. We estimate that the proposed gravel mine will have a significant negative impact on housing values in Richland Township. Once in full operation, the gravel mine will reduce residential property values in Richland and Richland Township by $31.5 million dollars, adversely impacting the values of over 1,400 homes, which represent over 60 percent of the Richland residences.

In addition, the mining operation will have an insignificant impact on area employment and personal income. At most, we estimate that only 2 additional jobs will be created in Kalamazoo County due to the mining operation. The mining operation serves the local market, and analysis based on the Institute's econometric regional model for the Kalamazoo region shows that it will bring in an insignificant

amount of new income into the area's economy, $58,000. Although the mine will employ an estimated 5 to 10 workers and require drivers to haul an estimated 115 to 120 truck loads of gravel per day, most all of these jobs would simply "displace" any employment growth in the county's 15 existing gravel pits.

Stoneco has not established a need for new aggregate capacity. Kalamazoo County is currently serviced by 15 gravel operations, and in recent years, employment in the county has been shrinking and the population has been stagnant. Consequently, there is no *prima facie* case that new capacity is needed. To definitively determine whether such a need exists, we would need to have information on projected demand for aggregated material in the county and capacity of the gravel pits currently servicing the county.

Finally, a careful evaluation of the five impact studies presented by Stoneco finds that their methodologies are seriously flawed, and thus conclusions drawn from the analyses are invalid.

The Upjohn report was actually provided to the WTPC by a township resident. The resident also provided the WTPC with a January 2021 document submitted by Healthy Waters Alliance regarding a SUP application by R. Smith & Sons, Inc., to operate a gravel pit in Hope Township. The study, which cited and used the formula from the Upjohn report, found:

We firmly conclude that if the gravel pit were approved, the 253 listed parcels would suffer an immediate $6,819,086 valuation loss and Hope Township would incur an estimated $55,790 yearly loss in tax revenue. Of course the actual property value loss and tax revenue loss will be far greater than these figures when all affected properties are considered.

The data presented below clearly demonstrates very serious consequences not only to local property owners, but to the Township as well. And economic damage to the Township represents damage to all Township citizens, not just those in proximity to the proposed mine.

The resident additionally gave the WTPC the following article on the subject of mining and property values: Chuck Wallace, *What Can You Do Now? Property Values Decrease Around a Quarry* (November 2014). The author asserted:

The negative impacts on local property values of a new quarry operation in a community are clear and irrefutable. The reduction in value of properties are significant, as high as 25% or more, and are irrespective of whether a local resident actually sells his or her property. It is important to note that these impacts are permanent.

The WTPC admitted into the record a December 2014 e-mail from the township's zoning administrator to the township, which addressed gravel mines in the township and contained an attachment listing the mines and their status at the time. The list identified eleven gravel mines that had been grandfathered-in at various times and four gravel mines that had operated under

SUPs.  The list indicated that only five of the gravel mines remained in use in December 2014. We emphasize that this was a document from 2014, six years before Northstar submitted its SUP application.

## C.  WTPC MEETINGS, MINUTES, AND FINDINGS

There were six WTPC meetings or hearings in which the topic of Northstar's SUP application was discussed—April 28, May 26, June 23, August 25, September 22, and October 27, 2021.  At the meeting on April 28, 2021, public comments in the form of letters and e-mails were read or presented by the WTPC's chairperson,[6] along with, apparently, live comments by residents. There were 17 citizens who voiced opposition to Northstar's SUP application; one person was in favor of the SUP request.  The persons against the planned mining operation expressed concerns about noise, safety on the roads in light of the envisioned truck traffic, pollution, health problems, loss of property values, road congestion, use of aggregate materials outside the township, dust, and aquifer impact.  The meeting minutes note that Northstar's attorney remarked that sand and gravel constitutes a natural resource for purposes of MCL 125.3205(3) and (4).  One of the seven WTPC members declared a conflict of interest and abstained from discussing and voting on the SUP application because he lived in close proximity to the planned mining operation.

The next meeting was on May 26, 2021, where there was further consideration and discussion of the SUP application, including matters regarding "need" and "very serious consequences."  A motion passed to table further discussion and a vote so that more research could be done on those topics.  On June 23, 2021, another meeting was held on Northstar's SUP application.  The minutes reveal discussions regarding "need," "very serious consequences," the necessity of obtaining studies and reports on subjects pertinent to the mining operation, such as traffic, road integrity, and safety, and the funding of studies and reports.  According to the minutes, one WTPC member "said he has seen/reviewed documents/reports about the number of mines and costs of gravel not increasing."  We note that no reports or documents suggesting that the cost of gravel was not increasing were ever made part of the WTPC record.

The minutes from July 28, 2021, indicate that the WTPC members discussed sources for funding experts and studies regarding the impact of the proposed sand and gravel mining operation, whether new studies and reports were even necessary, the names of professionals who could perform studies and appraisals, and the need to obtain all of the information possible to make an informed decision.  The minutes reveal that Northstar had submitted studies and reports in support of the SUP application, that some WTPC members were hesitant to simply accept Northstar's information and documentation, especially considering that Northstar had paid to have the studies and reports prepared, and that in the minds of the members the entire process needed to move forward.  One WTPC member indicated appreciation in regard to Northstar's submissions, but she then opined that the studies failed to show the very serious risks voiced by township residents, making it imperative for the WTPC "to do our due diligence for our residents."  Another WTPC reiterated concerns regarding the trustworthiness of Northstar's studies and reports because Northstar had paid the experts for their work.  Northstar's attorney acknowledged that Northstar

---

[6] These letters and e-mails are part of the WTPC's record.

had paid for the studies as part of its effort to secure a SUP; nonetheless, the reports were all prepared by "professionals" in their respective fields. We note that ultimately the WTPC did not hire its own experts to conduct studies and prepare reports concerning impacts of the proposed mining operation on the township. Instead, the WTPC placed significant reliance on citizen input and old reports and studies of sand and gravel mining operations outside of the township. As indicated earlier, these documents were supplied to the WTPC by a township citizen.

On August 25, 2021, another WTPC meeting was held regarding Northstar's SUP application. One member stated that he had checked into a property-value-impact study, which would cost $20,000, and a traffic-impact study, which would cost $12,000. WTPC members indicated that the studies were cost prohibitive, and the studies were not pursued. The minutes note that a professional expert communicated to members that he had some hydrogeologic concerns about the mining project, but he was unavailable to conduct a study. And no details regarding the expert's concerns are in the record. The meeting minutes also provided, "It was determined the professional expert found the presented information (submitted to Planning Commission from Northstar . . .) as insufficient and inadequate and in further need of review." This appears to be just a blanket statement absent any explanatory details whatsoever or a supporting affidavit, study, or report. According to the minutes, the township's zoning administrator observed that "from her experience, the studies done on behalf of, and paid for, by Northstar . . . are from reputable businesses." There were more discussions regarding the meaning of "need" and "very serious consequences." There was also an indication that Northstar had "provided a good amount of information for the board to use in rendering a decision along with the input of residents." Northstar representatives spoke about working with the road commission to address road issues or questions that had arisen and about studies being currently done regarding road speed and safety improvements for purposes of identifying future actions that could be taken if the SUP application were granted. The meeting minutes state that a vote on the SUP request would be taken at the next hearing.

The next meeting was conducted on September 22, 2021, and the meeting minutes are quite extensive. The WTPC members shared their various thoughts on the SUP application in the context of the criteria set forth in ZO, §§ 15.02 and 17.07. The comments were generally against granting the application. The minutes indicate that one WTPC member "believe[d] the board can make decisions for the moral and well being of the residents beyond the ordinance and with the stewardship and oath . . . taken to protect the residents[.]" According to the meeting minutes, another WTPC member reiterated

> that he does not think a gravel pit belongs next to residential homes. "It is 'their' community." It is a huge impact you can never bottle it up. "It's a gravel mine." It doesn't belong next to houses. He is looking out for residents safety and well being.[7]

---

[7] An audio recording of the meeting revealed that this member stated:

-13-

Another WTPC member questioned the need for a gravel pit because there were already six gravel pits in the township and 36 throughout Allegan County. Yet another WTPC member observed that Northstar's expert's opinion that property values are not impacted and some are improved when a sand and gravel mining operation is started was contrary to the Upjohn study and destroyed the credibility of Northstar's expert. One WTPC member emphasized that not one resident in the neighborhood around Northstar's property wanted the gravel pit, that the question should focus on what the township would get out of the mining operation, that he could see no benefit to the township or its residents if the SUP were granted, and that his concern was for the emotional and mental health of the township's citizens given the serious impact a mine would have on their lives. Other comments and remarks by members included claims that a mine would not comply with the Master Plan, that property values would suffer, that there would be a very serious impact to water in the area, that the cash-strapped township would suffer a serious reduction in tax revenue given the reduction in property values, that there was no scarcity of aggregate materials in light of 36 county and six township mines, and that there would be a huge impact on the safety of township residents.

After the discussion of the various issues, a roll call vote was taken on each individual factor in ZO, § 15.02(a)-(f), and on each individual factor in ZO, § 17.07(c)(1)-(6). Although some members found that a few of the factors favored Northstar or that there was insufficient information on particular factors, the vast majority of the votes by the members on the 12 total factors were unfavorable to Northstar. A motion to deny Northstar's SUP application was approved 6-0 by roll call vote. The meeting minutes concluded with eight enumerated findings of fact, some of which are fairly extensive and actually contain multiple factual findings. These findings form the crux of this case and appeal. Because of their importance, we quote most of the findings in their entirety.

Fact finding #1 (full finding):

> The request for SUP is incompatible with sustaining the long term planning of the need to protect strategic areas, "for future residential cluster development" as identified in the (Watson Township Master Plan). A mine in this location will delay the overall rate of growth and increased tax revenue benefiting all residents. The needs of the community are best served by following the Master Plan. The Upjohn report identifies with credibility that indeed property values are impacted. The report identifies that property values closest to a mine can be impacted up to 30-50%, while others, further away, will be impacted from 10-30%.

---

> I can't do it to the citizens. The other stuff is just kind of fodder. I realize from a legal standpoint we need to look at this, but I just can't do this to our citizens. No way am I going to allow someone coming from the outside and upend their way of life for a capitalist venture.

Fact finding #2 (full finding):

> The State of Michigan clearly intended for localities to regulate land use, including the extraction of natural resources other than oil and gas[.] (Metamora Twp. v American Aggregates of Michigan). The Planning Commission of Watson Township has no aversion to mining, as to date there are 4-6 mines located within the township, and others that have been grandfathered in under old regulations. Watson Township within Allegan County has 36 mines (Office of Mineral Management).

Fact finding #3 (full finding):

> The Planning Commissioners have a stewardship, and have taken an oath, to protect Watson Township and its residents from any safety, health and welfare issues that arise under its jurisdiction. As the smallest township within Allegan County the tax revenue is limited. Adding an additional mine in a residential area will have a serious impact on planned residential development and a loss of tax revenue. Additionally, with a revenue decrease—is the serious impact on residential value of homes in the vicinity. (American Aggregate Corp. v. Highland Twp.) & (Silva v Ada). The serious decrease in property values from 30-50%. (American Aggregates Corp. v Highland Twp) will cause serious injury to the Township's ability to meet financial needs in the applicant's proposed 10-15 year time span.

Fact finding #4 refers to MCL 125.3205(5)(d) ("The impact on pedestrian and traffic safety in the vicinity of the property and along the proposed hauling route serving the property") and (e) ("The impact on other identifiable health, safety, and welfare interests in the local unit of government"). We summarize these findings. The WTPC found a serious risk of loss of property values and a serious risk to life along the truck hauling route, which together constituted "a very serious consequence for the safety, health and wellbeing of residents and those traveling along the proposed hauling route." The WTPC found that there would be dangers associated with trucks hauling sand and gravel when negotiating a particular curve, when making turns, and when passing each other on the local roads. The WTPC noted the size of the trucks, the width of the roads, and the softness of the roadway shoulders. The WTPC opined that a study supplied by Northstar which showed that the roads were compatible with the gravel trucks was "insufficient." The WTPC dismissed a Northstar offer of .10 per ton of product removed from the mine to cover township costs for tax impact and road maintenance. The proposal, according to the WTPC, would not suffice to remove the very serious impact on the township's financial responsibilities or to offset the devaluation of property values. Because of a lack of clarity regarding road maintenance costs and whether townships or the Allegan County Road Commission are obligated to cover certain costs, the township, according to the WTPC, would incur an undue financial burden for costs associated with road repairs and maintenance necessitated by the 880 gravel trucks that would be traveling the township's roadways each month. The WTPC stated that "[u]ntil a financial agreement for road repairs, expansion and recommendations from the Department of Transportation are met, this [SUP] application cannot be approved." The WTPC also complained that Northstar had failed to address the impact of its proposed business on a particular intersection and stopped short of identifying a remedy to make the intersection safe.

-15-

With respect to fact finding #5, the WTPC addressed ZO, § 15.02(c) (will the proposed use "be detrimental or injurious to the use or development of adjacent properties or to the occupants thereof or to the general neighborhood") and (d) (will the proposed use "promote the public health, safety, morals and general welfare of the community"). With some identified omissions, we quote fact finding #5 in full:

> The Special Use permit standard is not met for land usage in R1 to accommodate another mining operation. The voice of the residents as identified in the Public Hearing and recorded in the April 2021 minutes, and subsequent Planning Commission meetings, only leads this Planning Commission to support residents in their rejection of the proposed gravel mine as the safety and welfare and health of residents will be greatly impacted and put very serious risk to their property values . . . . Also, the standard set forth in . . . *Silva* . . . applies to the serious impact with land uses in the vicinity of the property; the impact on property values; and the impact of the hauling route; the impact on public interest; as well as the lack of proof of NEED as defined in the dictionary . . . . And in order for there to be a "need," there must be a lack of supply. The moral and general welfare of the community will be jeopardized. There is low public interest because the price of a resource is not affected by the addition of another mine in the area served. There are several gravel pits/mines available in Allegan County as well as Watson Township[.] . . . The proposed mining operation will be detrimental to adjacent property values and decrease and place an undue burden on the township tax revenue. In a small township strapped for budget needs being met, and the added expenses for maintaining the roads used by heavy gravel trucks places the community in a huge deficit. The costs of improving and maintaining the hauling route roads is beyond the budget capacity!

Fact finding #6 (full finding after the WTPC first noted that for planning purposes under the Master Plan it was useful to recognize and understand that various roads within the township serve different functions):

> The roads identified for the hauling route were not designated for heavy gravel trucks. The volume of truck traffic increase plus the narrow roads, lack of shoulders, and lack of safety features along the hauling route with speeds allowed up to 55 mph will greatly increase the serious risk to residents and those folks traveling along these roads. Residents have voiced safety concerns in the Public Hearings about the hazardous conditions, including curves, hills, overpass, blind spots, and lack of speed control, road width, no turn lan[e]s and no safety controls (light) at the major intersection of M 222 & 12 St. Time studies of double gravel trucks (weighing 164,000 lbs) pulling onto M 222 from 12th street have not occurred and have yet to produce a remedy to the serious safety factors associated with the gravel trucks.

Fact finding #7 (full finding after the WTPC first noted the need to consider under the Master Plan the ability of existing roadway construction to handle projected traffic volume that results from new development arising from granting a zoning request such as a special use):

According to the applicant's numbers; 154 days per year – 40 gravel truck trips – 20 round trips per day – 880 gravel trucks per/month; 154 days per year = 6,160 gravel trucks on the roads per year x 10-15 years. ***This has a HUGE impact on the neighborhood and general welfare of the community. . . .***

Fact finding #8 (full finding):

Watson Township may consider many factors in approving or denying a SUP. The township is not limited to what the applicant identifies as "very serious consequences" and hence has identified a very serious impact and consequence to the health, welfare and safety of its residents. The identified risks with mining operations are not denied by the applicant as they acknowledge inherent risks, but the applicant mitigates the risks by downplaying ALL impact, most importantly those placed on the residents and township for a 10-15 year span of time. This proposed traveling/hauling route and adjoining roads are where most residents/school buses and recreational traffic (accessing Big Lake) and major access to thoroughfares have to travel each day. The increase in hazardous road conditions caused by the number, weight, and road limits, immediately becomes a very serious consequence. These roads are the only paved roads for a quadrant of the township to access major thoroughfares. These issues have substantial merit in determining that the detriment to the people in Watson Township supersedes the projected monetary needs of the applicant. That the benefits of having a seventh mine in a small township does not merit a SUP as there are plenty of resources available. That the loss of 10-15 years of land development, tax revenue and property tax loss will have a huge impact on the financial stability of Watson Township. The quality of life the residents have chosen for a rural lifestyle is diminished by all the risk factors identified in the applicant's application.

The meeting minutes from October 27, 2021, simply reflect that the permanent record for the denial of Northstar's SUP request would be immediately filed.

### III. CIRCUIT COURT PROCEEDINGS

On November 2, 2021, Northstar, in a single document, filed a claim of appeal and a civil complaint against the township and the WTPC in the circuit court. With respect to the claim of appeal, Northstar argued, in part, that the WTPC's decision was not supported by competent, material, and substantial evidence on the whole record. Northstar built much of the appeal around MCL 125.3205, first contending that it supplied the WTPC with evidence demonstrating that no very serious consequences would result from its planned mining operation, and next maintaining that Northstar needed the natural resources. In regard to serious consequences, Northstar argued that it had provided the WTPC with professional studies or reports which established that a mining operation would not have a negative impact on the market value of residences in the pertinent area, nor would it impact the marketability of such residences. Northstar further asserted that it had submitted a traffic impact study, which essentially showed that a mining operation would not pose any safety problems and that the existing roadways were adequate to handle the gravel trucks.

-17-

Northstar additionally claimed that it had tendered a wetlands study in which the specialists concluded that the planned mining operation would have no adverse impacts to onsite wetlands or adjacent wetlands. Northstar next proffered that the Allegan County Road Commission had granted a driveway permit for the location. Northstar argued that the road commission had informed the WTPC that it had no concerns about truck traffic from the mining operation and that the main throughways were designed for trucks. Northstar asserted that gravel trucks would only use a short stretch of township roads and travel through a mainly industrial-agricultural area to access M-222. Northstar further argued that it had provided the WTPC with a letter from the local school district indicating that it had no concerns regarding truck traffic, and Northstar noted that it had informed the WTPC that it would schedule truck departures so as not to conflict with school bus operations.

Northstar posited that it had supplied the WTPC with an environmental impact study, demonstrating the absence of very serious consequences should the mining operation commence. Northstar next alleged that the WTPC had asked Northstar to answer a grand total of 82 questions, many of which had subparts, and that Northstar answered all of the questions. Yet, despite Northstar's compliance with the WTPC's request to answer the questions, the WTPC effectively ignored the responses and never challenged or rejected Northstar's answers. Northstar contended:

> Despite [Northstar] having provided data driven analysis on every issue related to the determination of whether or not the mining operation would create very serious consequences (a test the [WTPC] adopted) and the need for such resources (supported by studies from the Michigan Department of Transportation and testimony and Affidavit of [Northstar's] Chief Operating Officer, Matt Double) a majority of the members of the [WTPC] refused to accept or consider the evidence presented by [Northstar's] supportive studies for unsupported reasons which were not based upon countervailing data, opposing studies, or for any other reasons supported by competent, material and substantive evidence on the record.

In the claim of appeal, Northstar accused various members of the WTPC of refusing to accept Northstar's data and studies on the unsubstantiated basis that they could not trust Northstar, being overheard stating that they simply were not going to allow a mining operation in a residential area regardless of Northstar's reports, demanding irrelevant information, disbelieving Northstar's studies absent having any evidence to the contrary, and generally rejecting valid evidence for spurious reasons.

Northstar next focused on the "need" for aggregate, arguing that the WTPC relied on unsubstantiated and false claims regarding the number of active mining operations in the county, the number of operating mines in the township, and the prices for aggregate, which the WTPC erroneously asserted were dropping. Northstar maintained that the WTPC's determination that there was no "need" for the natural resources was not supported by competent, material, and substantial evidence.

In sum, Northstar argued that the WTPC's decision to deny the SUP application was not supported by competent, material, and substantial evidence on the whole record. Rather, according to Northstar, the WTPC's "decision was based upon conjecture, rumor, and hearsay without any material supporting evidence[.]" Northstar contended that the WTPC "had already made a

decision that the [a]pplication should be denied irrespective of any kind of evidence[.]" Citing many of the claims discussed above in relation to the substantial-evidence test, Northstar concluded the "claim of appeal" section of its filing by arguing that the WTPC's decision was not authorized by law.

With respect to the civil complaint, Northstar alleged a violation of the MZEA, a violation of Northstar's state and federal constitutional due-process rights, and a violation by the WTPC of Const 1963, art 1, § 17, which entitled Northstar to fair and just treatment in the course of legislative hearings.

On January 7, 2022, the WTPC and township moved for summary disposition of Northstar's civil complaint under MCR 2.116(C)(4), arguing that the circuit court lacked subject-matter jurisdiction over the complaint because Northstar's allegations effectively constituted an appeal of the WTPC's decision and could not serve as the basis of an original action. On January 26, 2022, a stipulated order was entered dismissing the counts in the "complaint" portion of Northstar's filing. The dismissal was without prejudice. The parties agreed that the substance of the dismissed complaint would not be used in the circuit court appeal by Northstar and that any claims in the appeal that might also be deemed part of the complaint would "not suffer any disability on account of the . . . dismissal." As part of the stipulation, the WTPC and township agreed that if the civil complaint was subsequently filed, the WTPC and township would not raise any defense under the statute of limitations.

On April 13, 2022, Northstar moved to supplement the record pursuant to MCR 7.122(E)(6), which provides that "[m]otions regarding the contents of the record or to prepare a transcript of proceedings before the officer or entity must be filed within 21 days after transmission of the record to the court." Northstar argued that the record was incomplete because relevant and material statements made by certain WTPC members were omitted from meeting minutes. Northstar contended that the comments demonstrated that the WTPC's decision was not supported by competent, material, and substantial evidence. Northstar sought to depose WTPC members regarding remarks at a meeting so as to provide the circuit court with a complete record. Northstar attached an affidavit by one of its consultants who was at the meeting conducted on June 23, 2021, and the consultant averred that he heard one of the WTPC members state at the meeting that he would not believe any study showing that property values would not drop because of the planned mining operation. We note that the record contains an audio recording of the May 26, 2021 meeting and a video recording of the meeting on September 22, 2021. A recording of the June 23, 2021 meeting was apparently taped over when minutes were being prepared. The circuit court denied the motion to supplement the record, ruling that the existing record was sufficient, that meeting minutes are not supposed to be verbatim reproductions of a meeting, and that it was unnecessary to open discovery for one missed remark.

The parties filed appellate briefs in the circuit court and then presented oral arguments to the court on September 19, 2022. The parties' arguments focused on "need" and "very serious consequences" in connection with Northstar's attempt to open and operate a gravel pit. The arguments parallel those made to this panel in their respective briefs on appeal. To avoid redundancy, we shall discuss the arguments in the analysis section of this opinion when pertinent to resolving the appeal. We do note that at oral argument in the circuit court, the court spent considerable time attempting to obtain the attorneys' positions regarding what did and did not

-19-

constitute "evidence" in the WTPC proceedings. The circuit court took the appeal under advisement. On September 30, 2022, the parties appeared in court, and the circuit court delivered an oral decision from the bench.

The circuit court first directed its attention to the issue of "need," noting that it found persuasive this Court's opinion in *Metamora Twp v American Aggregates of Mich, Inc*, unpublished per curiam opinion of the Court of Appeals, issued April 1, 2021 (Docket No. 349069). As indicated earlier, the WTPC had relied on *Metamora Twp*. In that case, this Court construed the term "need" as used in MCL 125.3205, relying on a dictionary definition to rule that "in order for natural resources to be needed, the resources must be 'requisite, desirable, or useful' and there must be 'a lack' of them such that a 'supply' is required." *Metamora Twp*, unpub op at 10, citing and quoting *Merriam-Webster's Collegiate Dictionary* (11th ed).[8] Here, the circuit court found "too simplistic" Northstar's contention that "need" was established merely because Northstar claimed that it needed its own source of aggregate to stay competitive and remain in business. The court appeared to accept the WTPC's assertion that there was not a lack of natural resources—sand and gravel—in the township. The circuit court referenced the 2014 e-mail regarding the number of mines in the area, while noting that there "was other evidence or other testimony" through statements by the township supervisor and residents that there were at least four to six mines, "but certainly more than 1 or 2 which was the assertion of [Northstar]." The circuit court mentioned the market-value-impact report by James A. Van Stensel, Jr., that was submitted by Northstar, observing that the author had studied one or two mines in Allegan County without stating whether he had actually examined "all the potential gravel pits or mines [i]n Watson Township." The court ruled, "So in regards to the issue of whether or not there is need when there's already existing gravel mines or pits in Watson Township the record supported the [WTPC's] statement more than it did [Northstar's]."

Additionally, on the issue of "need," the circuit court pointed to page 15 of the Van Stensel report, in which the author, describing the planned future aggregate mining operation, stated that "[t]he aggregate material will be stockpiled in a delineated stockpile area *until needed*." (Emphasis added.) The circuit court commented:

> So if in fact the material was to be stockpiled when needed does that mean there is a need currently and I think that might be also an issue of need that the Court found to be concerning in regards to whether or not . . . [Northstar] had a need. Does the need have to be in the future? Does the need have to be current? The Court did not receive any arguments about that but the - - the need in that report somewhat contradicted to a certain extent the affidavit of [Double] in that [Double] was certainly in his affidavit was more forceful in indicating that he needed the business now. So that inconsistency was of concern to the Court.

---

[8] "Although MCR 7.215(C)(1) provides that unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value." *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017).

The circuit court then explained that even if Northstar's position on "need" were correct, the court was still obligated to assess whether the WTPC's decision was authorized by law and supported by competent, material, and substantial evidence on the whole record. The court noted that *Hughes v Almena Twp*, 284 Mich App 50; 771 NW2d 453 (2009), indicated that relevant public comments can be considered evidence. In *Hughes*, this Court did briefly note that "[p]ublic comment before the township board also supported" a particular factual finding. *Id.* at 75. In our case, the circuit court moved on to acknowledge the competing reports and studies that the parties had submitted to the WTPC concerning the impact of a mining operation on surrounding property values. The court remarked that although Northstar claimed that the Upjohn report given to the WTPC had been discredited, there was no evidence to that effect. Indeed, the circuit court concluded that none of the reports and studies had been discredited. Given the Upjohn report and the Healthy Waters Alliance study indicating that mining operations cause a decrease in the market value of properties near a gravel pit, the court found that there was competent, material, and substantial evidence on the whole record to support the WTPC's position. The circuit court explained that under the caselaw reversal is not justified simply because there is evidence that could support an alternate determination. The court then made the following broad, vague statement:

> In addition Watson Township considered its Master Plan, citizen input, the need in the community, and they had several evidentiary issues before them that they could consider and they were substantial. They were not insignificant reports.

The circuit court next acknowledged Northstar's argument that there were comments and remarks by WTPC members in the record suggesting that denial of the SUP application was predetermined. The court appeared to agree with Northstar, stating that "there's no doubt about it[.]" But, according to the circuit court, this did not mean that there was a lack of substantial evidence to support the WTPC's decision to deny the SUP application. The court commended Northstar for doing "its work" with respect to the submission of all the reports and studies to the WTPC. The circuit court observed, however, that its ruling could not be based on which party presented the most reports and studies; rather, the court's ruling had to evaluate whether there was substantial evidence supporting the WTPC's decision, i.e., more than a scintilla of evidence that need not amount to a preponderance. The court stated that despite Northstar's argument to the contrary, there was evidence supporting the denial of the SUP application. The circuit court concluded its opinion as follows:

> So based on my review of the case first of all I would indicate that I don't believe it meets that Northstar met a need but even if the Court did determine they did meet that part of the statute the Court would still determine that the [WTPC] made a decision that was supported by competent material and substantial evidence on the whole record.[9]

---

[9] At no point during the court's bench opinion did the court reference the phrase "very serious consequences."

On October 13, 2022, the circuit court entered an order affirming the WTPC's decision for the reasons set forth in the court's bench opinion. Northstar then filed a claim of appeal in this Court.

## IV. ANALYSIS

## A. THE PARTIES' ARGUMENTS

Northstar argues that the WTPC's decision was not supported by competent, material, and substantial evidence on the whole record. Northstar contends that the WTPC rejected its compelling evidence for spurious reasons, as reflected in some of the remarks by WTPC members during the proceedings, and that the WTPC did not produce any material, substantial, and compelling evidence of its own to support denial of the SUP application. Northstar complains that one WTPC member revealed personal bias when he indicated that no evidence would convince him to vote in favor of the SUP request. Further, Northstar maintains that the WTPC ignored the mandates of MCL 125.3205 and wrongly denied the SUP application on the basis, in part, that the project was located in a residential zone. Additionally, Northstar asserts that the WTPC improperly rejected its property-value-impact reports absent relevant evidence to the contrary. Northstar posits that the property-value-impact studies that the WTPC relied on addressed properties that were not comparable to Northstar's land and had nothing to do with the township. Next, Northstar argues that the WTPC rejected its data on wetlands and water resources on the basis of incompetent evidence from some unqualified "professional expert" who neither reviewed Northstar's studies nor visited the property. Indeed, the "professional expert" did not even submit a study, report, or analysis to the WTPC.

Moreover, Northstar contends that the WTPC ignored its professional reports regarding the adequacy of the roadway for the proposed mining operation, relying instead on personal beliefs and opinions. Northstar claims that one of WTPC's members essentially conceded that the WTPC did not have its own competent, material, and substantial evidence. Turning to the issue of "need," Northstar asserts that it provided clear and convincing evidence of need, which was countered with incompetent data and personal opinion and bias. Northstar also argues that the WTPC's decision denying the SUP application was not authorized by law, considering that WTPC members indicated that they would not support the application for spurious reasons, that the WTPC failed to produce competent evidence for the denial, rendering its decision arbitrary and capricious, and that the WTPC took the position that the project would not be allowed in a residential zone under any set of circumstances. Finally, Northstar maintains that the circuit court erred by drawing its own conclusions from the evidence instead of applying the substantial-evidence test, by ignoring substantial and relevant parts of the record, and by concluding that all public comments are evidence.

The WTPC makes an initial argument that this Court lacks jurisdiction because Northstar filed a claim of appeal when it was required to pursue the appeal by application for leave. The WTPC argues that its decision to deny the SUP application was authorized by law and supported by competent, material, and substantial evidence on the whole record. The WTPC contends that it was within its authority to deny the SUP application where there was competent, material, and substantial evidence that Northstar had failed to demonstrate a "need" for the sand and gravel to be mined. The WTPC asserts that MCL 125.3205 governs and that "need" under the statute

requires a showing of a lack of resources such that a supply must be obtained. The WTPC claims that the circuit court properly construed the term "need" pursuant to *Metamora Twp*, which Northstar does not challenge on appeal. The WTPC maintains that its decision to deny the SUP request due to lack of "need" was authorized by law in light of the evidence showing lack of need.

The WTPC next argues that even if Northstar demonstrated the requisite "need" for the aggregate, the WTPC was authorized by law to deny the SUP application because there existed competent, material, and substantial evidence that Northstar failed to meet its burden of showing that the proposed mining operation would result in no very serious consequences. The WTPC notes that the "very serious consequences" test balances the public interest in the materials to be mined with the anticipated consequences, which required Northstar to meet a high burden of demonstrating no very serious consequences. According to the WTPC, Northstar failed to meet its burden in light of the evidence of harm to residential property values, problems concerning traffic safety, road conditions, and maintenance costs, and a detriment to the township's future land use plan for growth and potential tax revenue.

The WTPC contends that Northstar's arguments for reversal lack merit. The WTPC asserts that the comments and questions raised by its members did not support reversal, that evidence of substantial harm to property values was properly considered, that Northstar failed to raise an objection regarding the continuing presence of the WTPC member who abstained from voting due to a conflict of interest, thereby waiving the issue,[10] and that if the WTPC's record was inadequate, the appropriate remedy would be a remand to the WTPC. Finally, the WTPC maintains that the circuit court employed the appropriate standard of review and did not engage in improper de novo review.

B. STANDARDS OF REVIEW

The ZO creates a zoning board of appeals (ZBA), but with respect to the appellate power of the township's ZBA, ZO 25.11(b) excludes the ZBA from reviewing "any requirements, decisions or determinations made with regards to *special uses*." (Emphasis added.) MCL 125.3606(1) provides, in part, that "[a]ny party aggrieved by a decision of the zoning board of appeals may appeal to the circuit court for the county in which the property is located." In this case, there was no decision by the ZBA because the ZO did not allow the ZBA to review a decision regarding special uses. MCR 7.122(G)(2) provides that "[i]n an appeal from a final determination under a zoning ordinance where no right of appeal to a zoning board of appeals exists, the [circuit] court shall determine whether the decision was authorized by law and the findings were supported by competent, material, and substantial evidence on the whole record."

This Court in *Ansell v Delta Co Planning Comm*, 332 Mich App 451, 457; 957 NW2d 47 (2020), observed that "MCR 7.122(G)(2) substantially mirrors MCL 125.3606(1) and Const 1963, art 6, § 28[.]" According to the *Ansell* panel, when a township's zoning ordinance fails to provide

---

[10] Northstar raises an argument on the matter. After the WTPC member declared the conflict of interest and abstention from voting at the very first WTPC meeting, the member nevertheless was present at all of the remaining meetings.

for review of a township board's or planning commission's decision on a request for a special land-use permit by a zoning board of appeals, the decision is considered to be final and subject to appellate review by the circuit court under Const 1963, art 6, § 28. *Ansell*, 332 Mich App at 458. And Const 1963, art 6, § 28, states:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record. . . .

As recognized by this Court in *Ansell*, the review standards in MCR 7.122(G)(2)—whether a decision was authorized by law and whether findings were supported by competent, material, and substantial evidence on the whole record—parallel those found in Const 1963, art 6, § 28. A decision or action is "authorized by law" when it is "allowed, permitted, or empowered by law." *Northwestern Nat'l Cas Co v Comm'r of Ins*, 231 Mich App 483, 488; 586 NW2d 563 (1998).[11] "Therefore, it seems clear that an agency's decision that is in violation of statute [or constitution], in excess of the statutory authority or jurisdiction of the agency, made upon unlawful procedures resulting in material prejudice, or is arbitrary and capricious, is a decision that is not authorized by law." *Id.* (quotation marks and citations omitted; alteration in original).

The substantial-evidence test encompasses a quantitative aspect, and "substantial evidence" is evidence that a reasonable person would accept as sufficient to support a particular conclusion. *Hughes*, 284 Mich App at 61. "While this requires more than a scintilla of evidence, it may be substantially less than a preponderance." *Id.* (quotation marks and citation omitted). Under the substantial-evidence test, it is irrelevant that the contrary position is supported by more evidence, that is, which way the evidence preponderates; rather, the circuit court must only be concerned with whether the position adopted by the agency is supported by evidence from which legitimate and supportable inferences were drawn. *McBride v Pontiac Sch Dist*, 218 Mich App 113, 123; 553 NW2d 646 (1996). When there is sufficient evidence, a reviewing court is not permitted to substitute its discretion for that of the administrative tribunal, even when the court might have reached a different result. *Id.* "Great deference must be given to an agency's choice between two reasonable differing views as a reflection of the exercise of administrative expertise." *Id.*

---

[11] We note that review of a site-plan and the approval or denial of a SUP request are essentially administrative in nature. *Sun Communities v Leroy Twp*, 241 Mich App 665, 669; 617 NW2d 42 (2000). And a township planning commission is considered to be an administrative agency. *Keating Int'l Corp v Orion Twp*, 51 Mich App 122, 125; 214 NW2d 551 (1974).

"This Court reviews the circuit court's decision de novo because the interpretation of the pertinent law and its application to the facts at hand present questions of law." *Ansell*, 332 Mich App at 456; see also *Hughes*, 284 Mich App at 60. The *Hughes* panel further explained:

> This Court reviews the circuit court's determination regarding [factual] findings to determine whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the . . . factual findings. This standard regarding the substantial evidence test is the same as the familiar "clearly erroneous" standard. A finding is clearly erroneous if the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made. [*Hughes*, 284 Mich App at 60 (citation omitted).[12]]

Finally, jurisdiction is a question of law that this Court reviews de novo. *Jeffrey v Rapid American Corp*, 448 Mich 178, 184; 529 NW2d 644 (1995).

## C. DISCUSSION AND RESOLUTION

### 1. JURISDICTION

The WTPC argues that this Court lacks jurisdiction over Northstar's claim of appeal because there was no appeal by right and Northstar was required to file an application for leave to appeal under the procedural circumstances of the case. MCR 7.203(A), which pertains to the jurisdiction of the Court of Appeals, provides, in pertinent part:

> The court has jurisdiction of an appeal of right filed by an aggrieved party from the following:
>
> (1) A final judgment or final order of the circuit court, or court of claims, as defined in MCR 7.202(6), except a judgment or order of the circuit court
>
> (a) on *appeal* from any other court or *tribunal*[.] [Emphasis added.]

---

[12] In the oft-cited opinion in *Boyd v Civil Service Comm*, 220 Mich App 226, 234-235; 559 NW2d 342 (1996), this Court similarly declared:

> We therefore hold that when reviewing a lower court's review of agency action this Court must determine whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the agency's factual findings. This latter standard is indistinguishable from the clearly erroneous standard of review that has been widely adopted in Michigan jurisprudence.

MCR 7.202(6)(a)(*i*) defines a "final judgment" or "final order" in a civil case as including, in part, "the first judgment or order that disposes of all the claims and adjudicates the rights and liabilities of all the parties . . . ."

The circuit court's ruling constituted a final judgment or order, but it did concern an appeal. We conclude, however, that the WTPC is not a tribunal.[13] A "tribunal" encompasses an administrative agency when it is acting in a judicial or quasi-judicial capacity. *Natural Resources Defense Council v Dep't of Environmental Quality*, 300 Mich App 79, 86; 832 NW2d 288 (2013). "Quasi-judicial proceedings include procedural characteristics common to courts, such as a right to a hearing, a right to be represented by counsel, the right to submit exhibits, and the authority to subpoena witnesses and require parties to produce documents." *Id.* at 86. While some of these characteristics might apply, overall we cannot find that the WTPC acted in a quasi-judicial capacity. See *Ansell*, 332 Mich App at 453 n 1 ("the appeal in the circuit court was not taken from a court or tribunal because the planning commission is not a court and did not act as a tribunal in issuing the permits in question").

Finally, assuming that Northstar was required to file an application for leave to appeal, we shall treat the claim of appeal as an application for leave, grant leave, and substantively address Northstar's arguments. See *Wardell v Hincka*, 297 Mich App 127, 133 n 1; 822 NW2d 278 (2012) (In the interest of judicial economy, this Court may exercise its discretion and treat a party's claim of appeal as an application for leave to appeal, grant leave, and then address the substantive issues).

## 2. NEED

We initially note that for purposes of MCL 125.3205(4), there is no dispute that valuable natural resources are located on Northstar's property. MCL 125.3205(4) placed the initial burden on Northstar to demonstrate to the WTPC that there was a "need for the natural resources by" Northstar "*or* in the market served by" Northstar. (Emphasis added.) Northstar's "need" analysis focused on Northstar's need, not the market served by Northstar. The primary evidence that Northstar relied on to establish "need" was the affidavit of its co-owner Matt Double. Northstar also produced an aggregate price list covering several area sand and gravel companies, which reflected significant increases in the price of aggregate from 2017 to 2021. Because we find it persuasive, we adopt the dictionary definition of "need" employed by the panel in *Metamora Twp.* Accordingly, in order for the sand and gravel or aggregate to be needed by Northstar, it had to be requisite, desirable, or useful, and there had to be a lack of aggregate such that a supply was required. See *Metamora Twp*, unpub op at 10.

With respect to the WTPC's fact-finding on the issue of "need," the WTPC's actual findings were sparse. The WTPC found that "in order for there to be 'need,' there must be a lack of supply." The WTPC further found that "[t]here are several gravel pits/mines available in Allegan County as well as Watson Township[.]" Additionally, the WTPC stated that it had "no aversion to mining, as to date there are 4-6 mines located within the township, and others that have

---

[13] Obviously, the WTPC is not a court.

-26-

been grandfathered in under old regulations. Watson Township within Allegan County has 36 mines."[14] Effectively, the WTPC concluded that Northstar did not have a need for the natural resources, i.e., the sand and gravel, because there were other mines in the township and county that had available aggregate.

The circuit court concluded that the WTPC's finding of lack of need was supported by competent, material, and substantial evidence on the whole record. The court agreed with the WTPC's stance that Northstar did not "need" the natural resources because there were already four to six sand and gravel mines in the township. The circuit court also relied on the statement in the Van Stensel report that the sand and gravel would be stockpiled until needed, extrapolating from the statement that there would be no immediate need for the aggregate, which conflicted with Double's affidavit.

Double's affidavit indicated that the cost of aggregate had increased quite dramatically in the past five years due to increasing demand for and resulting shortages in aggregate and that transportation and maintenance costs had also risen, making it quite expensive to obtain sand and gravel from further distances, which was becoming necessary. Double averred that USA Earthworks was at times eliminated as a competitor in the bidding process for projects due to the increased costs. Double asserted that "USA Earthworks needs a ready supply of sand and gravel *and its own source* of sand and gravel to stay competitive in the marketplace." (Emphasis added.) Double reiterated "that USA Earthworks *cannot compete* with competitors in the marketplace *who own their own supplies* and that even now the need to go further away from projects to obtain materials at higher prices and higher transportation costs has taken away the ability in many cases to make competitive winning bids for projects." (Emphasis added.) The WTPC and the circuit court did not appear to appreciate that the main thrust of Double's affidavit and Northstar's position was that USA Earthworks needs *its own supply* of aggregate to remain competitive and stay in business. Additional averments by Double drive this point home, along with showing that the presence of other gravel mines in the township and county was not truly relevant:

> USA Earthworks needs a *ready supply* of sand and gravel to maintain its business. Your affiant and USA Earthworks have attempted to purchase land with sand and gravel deposits or to otherwise purchase sand and gravel deposits but such land and materials are not available to USA Earthworks *for its own ownership*.
>
> * * *
>
> Northstar Aggregates is the owner of significant sand and gravel deposits in Watson Township which are the subject of this application.
>
> Your affiant states that sand and gravel resources of the types used in its business have become increasingly unavailable in the Southwest Michigan market. For example, USA Earthworks attempted to purchase pea stone for a Kent County

---

[14] We believe that the WTPC meant to indicate that Allegan County had 36 mines. Although the WTPC members certainly made a variety of comments and remarks at the six meetings in regard to "need," the ultimate findings of fact govern our analysis.

road project and was only allowed to purchase 150 tons from the aggregate industries because the remainder of the material had already been sold. USA Earthworks required 600 tons of pea stone material and was unable to purchase it in markets nearby its project.

Your affiant states [that] in order to obtain the types of materials required for its projects, it has to go further and further outside of its area of operations in order to obtain material. [Emphasis added.]

Taking into consideration Double's affidavit and the aggregate price list, and without yet contemplating the WTPC's evidence, Northstar's ability to mine and use the sand and gravel on its own property is certainly requisite, desirable, and useful for purposes of remaining competitive in the marketplace in relation to its construction business. With respect to the question whether there is a lack of aggregate such that a supply is required, the issue of price or cost absolutely must be taken into consideration when the context concerns the sustainability of a business. In other words, it would be beyond ridiculous to conclude that a company did not "need" sand and gravel because there existed available aggregate that if purchased by the company at the particular going cost would render the company defunct or bankrupt. Double's affidavit makes abundantly clear that for USA Earthworks to remain competitive it needs its own supply of aggregate; implicit in his averments is that there is no available alternative that would keep it competitive.

The WTPC and the circuit court believe that the mere presence of other gravel pits in the township and county defeats Northstar's argument regarding "need." Assuming the existence of the gravel mines in the township and county as found by the WTPC and circuit court, there was no evidence whatsoever that these mining operations had the capacity to take USA Earthworks on as a customer, that they could supply USA Earthworks with the quantities of aggregate needed by the company, and, importantly, that they could supply USA Earthworks with aggregate at a price that would allow the company to be competitive in the marketplace.

Moreover, the WTPC's claims regarding township and county sand and gravel mines were dubious to say the least. The WTPC claims that there is comparable gravel throughout the township, citing in support a resident's e-mail. The e-mail is a lengthy diatribe against granting the SUP application, mentioning that the township "is rife with sand and gravel deposits," which are contained in 2/3 of the township, and that there are five "obvious unclaimed gravel mines along 13th St." Accepting for the sake of argument that some comments or remarks by citizens can constitute evidence, there needs to be some associated foundational evidence establishing that the citizen has personal knowledge and is otherwise qualified to speak on an issue. The e-mail does not provide such evidence. Moreover, the remarks in the e-mail do not effectively counter or contradict the averments in Double's affidavit.

The WTPC next relies on another citizen's written comment that there are eight sand and gravel mines in the area. Again, even if true, the lack of any details regarding these gravel pits makes this "evidence" irrelevant for purposes of undermining Double's affidavit. The WTPC also points to a letter by a resident who stated that "[t]he Adrianson pit is an existing use and is currently being wasted due to its abandonment by the prior operator." We have no foundation, no information on personal knowledge, insufficient details, and yet another failure to effectively contradict the averments in Double's affidavit. Another resident informed the WTPC, "I don't

believe that there is a need for gravel as several pits are not functioning right now because of a lack of need." Reliance by the WTPC on this statement again fails for the reasons alluded to above.

The WTPC next complains that on the issue of "need," Double answered a question posed to him by the WTPC that he simply desired to obtain sand and gravel at less cost. But we note that as part of that answer, Double also indicated that he could not source the aggregate from other mines at relatively the same cost. We strain to understand the WTPC's argument. When Double's or Northstar's answer is considered in conjunction with the other evidence, primarily Double's affidavit, it becomes clear that the lower price or cost was needed so that USA Earthworks could compete in the marketplace. In answering the WTPC's question whether there were any lost jobs because of the absence of available aggregate, Double or Northstar responded that "[t]here are a number of examples where jobs were not bid on *because the cost of material was too high* and material is not available from this site." (Emphasis added.)

The WTPC argues that Double did not provide any evidence that he lacked the ability to obtain aggregate from other sources. This argument misses the point; Northstar needs to access sand and gravel at a cost that makes USA Earthworks able to compete in the marketplace, and this assertedly can only be accomplished by the company having its own source of aggregate, which assertion the WTPC never disproved. We also note that, as quoted earlier, Double gave one example in his affidavit in which he could not obtain pea gravel from any source for a project in Kent County. The WTPC additionally contends that the record included documentation regarding gravel mines in the township, citing the 2014 e-mail from the zoning administrator. This was six years before Northstar submitted its SUP application. The fact that the WTPC and the township did not place into the record up-to-date documentary evidence on gravel pits in the township, which seemingly would be easily obtainable by governmental entities, and instead relies on citizen commentary, is puzzling.[15] Regardless, even if the 2014 information on gravel pits remained accurate in 2020-2021, the mere existence of these gravel pits, operational or not, does not effectively undermine Northstar's evidence that it is in need of the natural resources on its own property to remain competitive. There is no evidence regarding aggregate availability and pricing as to the other gravel pits. The WTPC cites a few more examples of evidence demonstrating no shortage of aggregate, but as we tediously explained above, it is the *cost* of available aggregate that forms Northstar's contention that it needs to have its own supply to compete in the marketplace.

---

[15] We do note that the meeting minutes from August 25, 2021, reflect that one of the WTPC members indicated that there were six to eight operating mines in the township, 36 mines in Allegan County, 41 mines in Kent County, and 24 mines in Barry County, which information was followed by a parenthetical to the Office of Mineral Management.

In sum, we conclude that the circuit court clearly erred by determining that there was competent, material, and substantial evidence on the whole record supporting the WTPC's factual finding that Northstar did not have a need for the natural resources located on its property.[16]

## 3. NO VERY SERIOUS CONSEQUENCES

MCL 125.3205(4) placed the initial burden on Northstar to show "that no very serious consequences would result from" the planned mining operation. And under MCL 125.3205(5), the Legislature dictated that the *Silva* standards must be applied when determining whether very serious consequences would result from extracting natural resources. A court may also consider, if applicable, the relationship between mining and existing land uses and the impact of extracting minerals on property values, on pedestrian and traffic safety, on the health, safety, and welfare interests held by the local governmental unit, and on the overall public interest in extracting natural resources. MCL 125.3205(5)(a)-(f).

The WTPC effectively determined that Northstar had failed to establish that no very serious consequences would result from the extraction of aggregate at the site. Accordingly, the circuit court had to assess whether there was competent, material, and substantial evidence on the whole record supporting the WTPC's finding that Northstar had failed to demonstrate that no very serious consequences would result from the proposed mining operation.

With respect to the findings of fact by the WTPC, the members found that Northstar's planned sand and gravel mine would seriously impact and lower property values in the area, that it would result in a decrease in tax revenue because of the lower property values, that it would be incompatible with the Master Plan, and that it would pose a serious risk to the safety and lives of its citizens because of the many dangers and hazards associated with trucks hauling aggregate on the local roadways. The WTPC further found that a gravel pit would create an undue financial burden on the cash-strapped township in relation to the cost of road repairs necessitated by the truck traffic, that it would cause a huge impact on the neighborhood and general welfare of the community because of the excessive presence of gravel trucks on the roads, and that it would diminish the quality of life of residents who had chosen a rural lifestyle. In the eyes of the WTPC, all of these projected consequences amounted to very serious consequences that would result if it granted Northstar's SUP application.

We conclude that the circuit court's ruling on the issue of "very serious consequences" was woefully inadequate. Indeed, the court never even mentioned the statutory terminology (very serious consequences), let alone apply it in the context of its ruling. The circuit court focused

---

[16] With respect to the circuit court's reliance on a single sentence in the Van Stensel report that the sand and gravel on Northstar's property would be stockpiled until needed, we fail to see any logic in the court's determination that this showed that Northstar did not need to mine the natural resources on its property. Van Stensel was simply describing the logistical aspects of mining, and clearly Northstar would have to stockpile aggregate at times in between different construction projects. The circuit court essentially concluded that only by immediately removing aggregate from its property could Northstar demonstrate need. We disagree with this view.

almost exclusively on the impact of a mining operation on property values. On the basis of the Upjohn report and the study by the Healthy Waters Alliance which both indicated that mining operations cause a decrease in the market value of surrounding properties, the court found that there was competent, material, and substantial evidence on the whole record to support the WTPC's decision. The circuit court determined that these studies or reports had not been discredited. The court was correct that the Upjohn report and the Healthy Waters Alliance study had not been directly discredited. But the circuit court did not appear to take into consideration that the Upjohn report was 15 years old and concerned different properties in a different township and a different mine operator and that the Healthy Waters Alliance study also pertained to a different township and operator, whereas Northstar offered two current studies of the impact of its proposed mining operation on the value of relevant properties in the relevant township. We are not holding that the circuit court's ruling on the matter constituted error, but on remand the court needs to address these distinctions between the competing studies and reports.

More importantly, even assuming that the circuit court properly found that there was competent, material, and substantial evidence demonstrating that Northstar's planned mining operation would decrease property values in the township, the court failed to take the necessary next step in the analysis. The circuit court had to evaluate whether there was competent, material, and substantial evidence showing that the decrease in value would constitute a *very serious consequence*, which analysis would rationally entail a determination regarding the extent of any decrease in value and the number of properties that would actually or likely suffer a decline in value due to a gravel pit. Moreover, there needs to be at least some contemplation of whether one lone consequence—a decrease in market value—can amount to very serious consequences. To be clear, we take no position on the matter.

Aside from the issue regarding the impact on property values, the circuit court, as noted earlier, stated:

> In addition Watson Township considered its Master Plan, citizen input, the need in the community, and they had several evidentiary issues before them that they could consider and they were substantial. The[re] were not insignificant reports.

This vague conclusory statement without any details provides no support for the circuit court's ruling. There is no dispute that the WTPC considered multiple issues, that the WTPC had substantial evidentiary issues presented to it, and that there were significant reports. The circuit court, however, was tasked with assessing whether there was identifiable competent, material, and substantial evidence supporting the WTPC's particular findings on the various issues, which the court did not do, except in connection with the property-value issue, and even then the court's analysis was inadequate and incomplete.

Finally, the circuit court appeared to accept Northstar's contention that the vote on its SUP application was predetermined as gleaned by comments and remarks made by WTPC members. But the court made short shrift of the issue by concluding that such predetermination did not correlate to a lack of competent, material, and substantial evidence supporting the WTPC's decision. While we do not necessarily disagree with the circuit court's reasoning, the problem is that the issue does not truly have a bearing on the substantial-evidence test but goes to the issue

whether the WTPC's SUP denial was authorized by law. And more particularly whether the WTPC's decision was arbitrary and capricious. *Northwestern Nat'l Cas Co*, 231 Mich App at 488. An arbitrary decision is one based on whim or arrived at without consideration of principles, circumstances, or significance, and a capricious decision is one that is apt to change suddenly or is freakish, whimsical, or humorous. *In re Keast*, 278 Mich App 415, 424-425; 750 NW2d 643 (2008). In this case, if the circuit court finds on remand in favor of the WTPC on the issue of "very serious consequences," the court shall entertain the issue whether the WTPC's denial of the SUP application was authorized by law.

We reverse and remand for proceedings consistent with this opinion.[17] We do not retain jurisdiction. Having prevailed on appeal, Northstar may tax costs under MCR 7.219.

/s/ Michael J. Riordan
/s/ Jane E. Markey
/s/ Christopher P. Yates

---

[17] We granted Northstar's motion to supplement the record. *Northstar Aggregates LLC v Watson Twp*, unpublished order of the Court of Appeals, entered June 22, 2023 (Docket No. 363567). For purposes of remand, the circuit court is to take into consideration the expanded record when ruling on the various matters that need further examination as outlined in this opinion.